**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

|  |  |
|---|---|
| ARIES LEGACY, LLC, Delaware corporation, CHRISTIAN CARLSON, DEAN RALPH SALERNO, ECRE1 LLC, an Arizona corporation, HUCKLEBERRY GLAM, INC., an Arizona corporation, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>INTEGRATED WEALTH STRATEGIES, LLC., a New Jersey Corporation, and JOSEPH C. MANIACI, JR., individually,<br><br>    Defendants. | Civil Action No.<br>1:25-cv-02118-VMC |

**ORDER**

Before the Court is Defendants Integrated Wealth Strategies, LLC ("IWC")

and Joseph C. Maniaci, Jr.'s ("Maniaci's") Motion to Dismiss Plaintiffs' Amended

Complaint pursuant to 12(b)(1), 12(b)(6), and 12(b)(7), and Motion to Stay

Proceedings (Doc. 23).

## Background[1]

Plaintiffs Aries Legacy, Christian Carlson, Dean Ralph Salerno, Huckleberry Glam, and ECRE1, LLC allege that Defendants induced them to invest in Real Estate Acceleration Loans ("REALs") offered by Drive Planning, LLC and its founder, Russell Todd Burkhalter from December 2022 through June 2024. (Doc. 18. ¶ 3–4, 56). Plaintiffs bring this action on behalf of themselves and a proposed class of investors to recover funds misused, commingled, and stolen by Burkhalter and Drive Planning, funds which investors invested on the direct recommendations of Defendants IWS and Maniaci. (*Id.* ¶ 7).

### I.    Related Actions

This case involves claims arising out of substantially the same subject matter and factual issues as a pending action filed by the Securities and Exchange Commission ("SEC") against Drive Planning and Burkhalter for originating and engaging in a $300 million Ponzi scheme that defrauded over 2,000 investors. (*Id.* ¶ 3). According to the SEC's complaint, filed in the U.S. District Court for the Northern District of Georgia, Drive Planning and Burkhalter lured investors with promises of lucrative returns through purported real estate investments which in reality were unregistered securities in the form of REAL agreements. *See Sec. &*

---

[1] Because this case is before the Court on a Motion to Dismiss, the following facts are drawn from Plaintiffs' Complaint and are accepted as true. *Cooper v. Pate*, 378 U.S. 546, 546 (1964).

*Exch. Comm'n v. Drive Plan., LLC*, No. 1:24-cv-3583-VMC (N.D. Ga, filed Aug. 13, 2024) (the "SEC Action"). (*Id.* ¶ 3).

On August 13, 2024, the Court granted the SEC's Motions to Appoint a Receiver and for Preliminary Injunctive and other Equitable Relief against Drive Planning and Burkhalter. The Court found that:

> The appointment of a receiver was necessary and that the SEC had established a prima facie case that Drive Planning and Burkhalter had engaged in and, unless restrained and enjoined by order of this Court, will continue to engage in acts, practices, and courses of business constituting violations of Section 17(a) of the Securities Act [15 U.S.C. §17q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

(SEC Action, Dkt. No. 10) ("Receivership Order").

In addition, related putative class actions have been filed. The first was filed in the Southern District of Indiana. *See* Order, *Williamson v. Linarducci*, No. 1:24-CV-01526-TWP-MJD, 2025 WL 2379272 (S.D. Ind. Aug. 15, 2025). Similar to the plaintiffs here, the plaintiffs in *Williamson* maintained that defendants there solicited them and other investors to invest in REAL agreements at non-party Drive Planning's instruction and, consequently, alleged violations of Section 12(a)(2) of the Securities Act of 1933 and various state law claims. *See id.* at *1. On August 15, 2025, the court granted the defendants' motion to dismiss with leave to amend the complaint on the grounds that the plaintiff failed to state a claim under

Section 12(a)(2) because they did not "allege[] that there was a prospectus in the transaction at issue as the investments were sold in a 'private offer.'" *See id.* at *5. The second was filed in this district. *Hauger v. SDWC Fin., LLC,* No. 1:25-cv-01058-VMC (N.D. Ga. Nov. 3, 2025). The Court dismissed that case for similar reasons.

Finally, on August 13, 2025, the Receiver filed suit against various individuals and entities, including Defendant IWC ("Receiver Suit"). Complaint, *Murena v. CQ Consulting Servs., LLC et al.*, No. 1:25-cv-04587 (N.D. Ga. Aug. 13, 2025). Through the Receiver Suit, the Receiver seeks, among other relief, return of commissions Drive Planning paid to entities and individuals such as Defendants. *Id.*

## II.    Relevant Facts

### A.    Overview of the Ponzi Scheme

More than 2,000 investors throughout the United States were victimized by a Ponzi Scheme under which they were induced and encouraged to invest large sums of money with the promise of high returns. (Doc. 18 ¶¶ 1-2). Investors were urged to use whatever money they had, including their savings, retirement accounts, 529 college plans, and open lines of credit to participate in what, unbeknownst to them, was a fraudulent scheme. (*Id.* ¶ 2). Defendant IWS is a business setting up Charitable LLC's ("CLLC's") for people wishing to maximize tax benefits. (*Id.* ¶ 4). Defendant Maniaci, one of the principals at IWS, and others

employed at IWS became agents of Drive Planning and their clients to create CLLCs and invest in Drive Planning products with the promise that their returns from Drive Planning would be tax minimized. (*Id.*). Defendants were aware, or should have been aware, that their investors' money was unsecured, and that the investment vehicle was nothing more than a massive scheme to defraud. (*Id.* ¶ 6).

In 2020, Drive Planning began offering to the public what it described in promotional materials as a "bridge loan opportunity promising 10% in 3 months." (*Id.* ¶ 23). Burkhalter named the investment vehicle REAL, an acronym for "Real Estate Acceleration Loan." (*Id.*). On September 22, 2020, Drive Planning received and deposited a check for $50,000 from the first REAL investor into a Drive Planning bank account at Truist Bank. (*Id.* ¶ 24). From September 22, 2020, to October 13, 2020, the account only received one additional deposit in the amount of 6 dollars. (*Id.*). On October 13, 2020, Drive Planning transferred $112,000 out of that account to a self-directed IRA. (*Id.* ¶ 25). Of this total, $90,671 in funds (the beginning Truist balance and the $6 deposit) were unrelated to REAL investments. (*Id.*). This means that the self-directed IRA transfer included at least $21,329 of REAL investment funds. (*Id.*). The self-directed IRA that received the $112,000 transfer, including funds from the first REAL investor, was for the benefit of an individual who had invested in a previous "energy" investment offered by Drive

Planning. (*Id.* ¶ 26). The terms of that investment called for principal and fixed return to be paid in October 2020. (*Id.*).

Drive Planning recruited IWS and Maniaci to sell REAL to prospective investors by claiming that Drive Planning would pool their money and loan it out to property developers, and/or enter joint ventures with property developers, and thereby generate the profit necessary to meet obligations to REAL said prospective investors. (*Id.* ¶ 50). On behalf of Burkhalter and Drive Planning, IWS and Maniaci offered the REAL investments for sale nationwide and accepted investments from international investors. (*Id.* ¶ 49). Burkhalter and Drive Planning paid sales agents, including IWS and Maniaci a four percent commission on each REAL investment sold, and additional commissions on amounts that investors chose to "rollover" into a new 90-day investment. (*Id.* ¶ 28).

Defendants sent their clients various materials created by Drive Planning describing and promoting their most popular "opportunities" for growing wealth passively, including the REAL investments and a CORE Fund, which included the purported purchase of tax liens for investment purposes. (*Id.* ¶ 3). As sales representatives trained and contracted by Drive Planning and offering financial services to their clients, Maniaci and other IWS agents and financial consultants provided potential investors, including Plaintiffs, with an information sheet regarding their most popular investment products to help them grow their wealth

passively. (*Id.* ¶ 46). The materials promise that the products are not speculative, are significantly low in risk, and all have "some form of substantial real estate backing them up." (*Id.*). The materials include links to Drive Planning's website for further information. (*Id.*).

Defendants distributed Drive Planning's marketing materials and promoted the REAL investments without conducting any due diligence to confirm that returns promised to investors were actually being paid from proceeds identified on the marketing materials. (*Id.* ¶ 52). The REAL brochure was promoted to prospective investors through the U.S. mail, by emailing it as a Portable Document Format (PDF), by reproducing it on the Drive Planning website, by handing it directly to prospective investors during in-person sales presentations, and by making hard copies available to Drive Planning's sales agents. (*Id.* ¶ 49). Defendants did not disclose to Plaintiffs that they were being paid on commission by Drive Planning based on the initial sale of the securities at issue or reinvestment after the term of each of the securities at issue. (*Id.* ¶ 53).

The interest from property developers in doing business with Drive Planning, however, proved insufficient, and Drive Planning had no other profit-generating enterprises sufficient to meet obligations to REAL investors, each of whom expected a ten percent return every 90 days. (*Id.* ¶ 51). In fact, Drive Planning did not have any legitimate profitable enterprise capable of generating

7

the sums necessary to pay the promised 10 percent returns every three months. (*Id.*). Instead, Burkhalter used money from new investors to pay the supposed "returns" to existing investors and to maintain a luxurious lifestyle. (*Id.*).

## B.    REAL Transaction Timeline

During December 2022, Defendants induced Carlson to invest in REAL agreements. (*Id.* ¶ 56). On October 19, 2023, Angelo Sandone, a financial consultant employed by IWS, sent an email to Carlson and Salerno promoting Drive Planning's products and inducing them to invest in those products. (*Id.*). On October 24, 2023, in response to questions from Salerno regarding the investments, an employee of Drive Planning instructed him to contact Maniaci at IWS with any questions. (*Id.*).

Plaintiff Aries Legacy was induced by Defendants to make seven investments to REAL with Drive Planning between October 24, 2023, and March 25, 2024, for a total investment amount of $1,075,700.00. (*Id.*). For each investment in the form of a "loan," Plaintiffs were guaranteed an interest rate of ten percent to be payable in three months, with an option to "rollover" all or part of that amount at the same or current rate for another three-month period. (*Id.*). The agreements state that a new note is not required for each new three-month period. (*Id.*). New promissory notes were given in the event an investor added additional funds to the existing loan. (*Id.*). The agreements contain an assurance that the note

is to be secured by real property located in Drive Planning Portfolio Properties, until the loan was paid back in full. (*Id.*). The agreements were all signed by Burkhalter, CEO, Drive Planning. (*Id.*). On February 13, 2024, Sandone told Carlson that Defendant IWS had a forensic accountant review Drive Planning's books and they all checked out, which was the basis for IWS's confidence in Drive Planning as a viable investment. (*Id.* ¶ 57).

On June 10, 2024, Drive Planning was forced by Truist Bank to cease accepting new investments in REAL as a result of the SEC's freeze of Drive Planning assets, and to cease paying commissions or paying supposed returns to investors. (*Id.* ¶ 44). Nevertheless, Drive Planning found a way to continue to pay sales commissions to its sales agents until at least June 21, 2024. (*Id.*). It paid Defendant IWS through at least May 31, 2024. (*Id.*).

On June 12, 2024, two days after Drive Planning was forced by the bank to cease accepting new investments in REAL, and to cease paying commissions or paying supposed returns to investors, Plaintiff Salerno sent an email to Drive Planning requesting a 100% distribution of the funds on all seven REAL promissory notes. (*Id.* ¶ 62). On June 14, 2024, Salerno received an email from Drive Planning assuring him that Drive Planning was operating as normal and informing him that he could only change his election for notes maturing from June 20, 2024, through July 14, 2024. (*Id.* ¶ 63). Only one of the promissory notes fell

9

within that period. (*Id.*). On June 17, 2024, Salerno was specifically informed he could not redeem a note even though he had only renewed it one week earlier. (*Id.* ¶ 64).

On July 23, 2024, an email was sent by Drive Planning to Salerno informing him that the delay in disbursing the funds he had requested was a result of the SEC's audit of REAL and CORE investments and again assured him that he would receive the funds as soon as possible. (*Id.* ¶ 65). Defendant Maniaci and Sandone, the financial consultant from IWS, were copied on all of these emails. (*Id.*).

Plaintiffs assert the following: each of the Drive Planning REAL agreements, which are in essence promissory notes, are "securities" under state and federal securities laws; Defendants were not registered to sell securities; Defendants lacked any Series 7 general securities representative license, were not registered representatives under Financial Regulatory Authority rules, or were not licensed as an investment advisor with the SEC; the REAL agreements were sold in a private offering, which did not qualify for any exemptions from registering the offering under SEC regulations; and the REAL agreements were not sold or carried on any national securities exchange. (*Id.* ¶¶ 58–61).

Plaintiffs bring claims for: (1) violation of § 12(a)(2) of the Securities Act; (2) violation of § 12(a)(1) of the Securities Act; (3) negligent misrepresentation; (4) common law fraud; (5) violation of the New Jersey Uniform Securities Act; (6)

10

violation of fiduciary duty to Plaintiffs and the Class; (7) professional negligence; and (8) unjust enrichment or other equitable relief. (*Id.* ¶¶ 79–131). Defendants have moved to dismiss the case on various grounds or stay it. (Doc. 23).

**Legal Standard**

The Court should dismiss a complaint under Rule 12(b)(1) only where it lacks jurisdiction over the subject matter of the dispute. "Because standing is jurisdictional, a dismissal for lack of standing has the same effect as a dismissal for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1)." *Stalley v. Orlando Reg'l Healthcare Sys.*, 524 F.3d 1229, 1239 (11th Cir. 2008). A motion to dismiss for lack of subject matter jurisdiction may be based on either a facial or factual challenge to the complaint. *See McElmurray v. Consol. Gov't of Augusta – Richmond Cnty.*, 501 F.3d 1244, 1251 (11th Cir. 2007). "A 'facial attack' on the complaint 'require[s] the court merely to look and see if [the] plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion.'" *Id.* (quoting *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990)). "Factual attacks, on the other hand, challenge the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits are considered." *Id.* (internal quotation marks omitted). Defendants' motion to dismiss based on lack of standing is a facial attack. Accordingly, the Court will accept as true the

11

allegations in Plaintiff's Complaint for the purpose of ruling on Defendant's motion to dismiss.

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). For the purposes of a motion to dismiss, the court must accept all factual allegations in the complaint as true; however, the court is not bound to accept as true a legal conclusion couched as a factual allegation. *Twombly*, 550 U.S. at 555. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679. Although the plaintiff is not required to provide "detailed factual allegations" to survive dismissal, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678; *Twombly*, 550 U.S. at 555.

Also at issue is Defendant's 12(b)(7) motion to dismiss for failure to join a party under Rule 19. Rule 19 provides a two-part test for determining whether an action should proceed in a nonparty's absence." *City of Marietta v. CSX Transp., Inc.*, 196 F.3d 1300, 1305 (11th Cir. 1999), *certified question answered*, 533 S.E.2d 372 (Ga. 2000). First, the Court considers whether the party is indispensable under Rule 19(a). *See id.* Second, if the Court finds that a party is indispensable, the Court

must determine "in equity and good conscience" whether the action should go forward under Rule 19(b). *Id.* Under Rule 19(a), a party is indispensable if: (1) in that person's absence, complete relief cannot be afforded among the parties; or (2) the absent party claims an interest relating to the subject of the action and is so situated that the disposition of the action may impair those interests or leave the other parties subject to a substantial risk of incurring multiple or inconsistent obligations. Fed. R. Civ. P. 19(a).

### Discussion

In their Motion to Dismiss, Defendants first argue that dismissal, or in the alternative, a stay is appropriate because of the Receivership Order in the SEC Action. Next, Defendants seek dismissal of Plaintiffs' federal claims based on failure to join an indispensable party, and/or insufficient pleadings or untimely claims. Finally, Defendants argue that the Court should not reach the merits of Plaintiffs' state law claims.

### I. Motion to Dismiss or Stay Under the Receivership Order

Defendants argue that this case should be dismissed or stayed because of the Court's Receivership Order in the SEC Action. The Court's Receivership Order stayed:

> [a]ll civil legal proceedings of any nature, including, but not limited to, bankruptcy proceedings, arbitration proceedings, foreclosure actions, default proceedings, or other actions of any nature involving: (a) the Receiver, in

> his capacity as Receiver; (b) any Receivership Property, wherever located; (c) the Receivership Defendant, including subsidiaries and partnerships; or, (d) the Receivership Defendant's past or present officers, directors, managers, agents, or general or limited partners sued for, or in connection with, any action taken by them while acting in such capacity of any nature, whether as plaintiff, defendant, third-party plaintiff, third-party defendant, or otherwise (such proceedings are hereinafter referred to as "Ancillary Proceedings").

(Receivership Order ¶ 32). Defendants argue that this case is an Ancillary Proceeding because it involves "Receivership Property" under prong (b), the "Receivership Defendant" under prong (c), and the Receivership Defendant's "agents" sued in connection with an action in that capacity under prong (d).

The Court has jurisdiction to interpret its own Orders. *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009). Receivership orders should be interpreted to further "the interests of equity and of the efficient and orderly administration of the receivership res." *Sec. & Exch. Comm'n v. Complete Bus. Sols. Grp., Inc.*, No. 20-CV-81205-RAR, 2024 WL 5348580, at *13 (S.D. Fla. Dec. 16, 2024). Ultimately, the Court's "power to supervise an equity receivership and to determine the appropriate action to be taken in the administration of the receivership is extremely broad." *Sec. & Exch. Comm'n v. Torchia*, 922 F.3d 1307, 1316 (11th Cir. 2019) (quoting *Sec. & Exch. Comm'n v. Hardy*, 803 F.2d 1034, 1037 (9th Cir. 1986)). The Court can readily conclude that this action does not "involve" Receivership Property because Plaintiffs' cause of action stems from harm done directly to

14

investors. The Court has already held in the SEC Action that the Receiver lacks standing to bring such claims, and by extension such claims are not property of the Receivership Estate. *Sec. & Exch. Comm'n v. Drive Plan., LLC*, No. 1:24-CV-03583-VMC, 2025 WL 1827684, at *6–7 (N.D. Ga. July 2, 2025) ("Georgia district and bankruptcy courts, as well as the Eleventh Circuit, have found a bankruptcy trustee [and by extension a receiver] does not have standing to bring a claim based on harm to the estate's creditors instead of the debtor."(quoting *In re Aliera Cos., Inc.*, 665 B.R. 468, 494 (Bankr. N.D. Ga. 2024))). That the Receiver Suit also targets Defendants does not impact the Court's conclusion because that suit seeks a return of commissions paid to Defendants, which is a separate injury from the harms to investors raised here.[2]

Moreover, the fact that the harm at issue stems indirectly from the actions of Drive Planning, the Receivership Defendant, does not mean that this case "involves" Drive Planning to the extent that it must be dismissed or stayed. Drive Planning is not a party to this case and the Receiver will not need to expend any estate resources defending it. *Cf. Fratelli Cosulich Unipessoal, S.A. v. Specialty Fuels*

---

[2] The one exception is the unjust enrichment count. That count alleges that "[t]hrough its unauthorized and continued use of Plaintiffs' funds, in the form of sales commissions and awards, Defendants have enjoyed and continue to enjoy an unjust benefit at the expense and to the detriment of Plaintiffs." (Doc. 18 ¶ 127). To the extent that this count seeks to recover commissions Drive Planning paid to Defendants, that would constitute a barred ancillary action. The Court will allow Plaintiffs leave to amend this count before passing upon it, however.

*Bunkering, LLC*, No. 13-CV-00545-KD-C, 2014 WL 2611547, at *5 (S.D. Ala. June 11, 2014) (explaining, in the bankruptcy context, that "[t]he automatic stay will apply to non-debtors only when a claim against the non-debtor will have an immediate adverse economic consequence for the debtor's estate" (quoting *Ritchie Cap. Mgmt, L.L.C. v. Jeffries*, 653 F.3d 755, 762 (8th Cir. 2011))); *see also Bendall v. Lancer Mgmt. Grp., LLC*, 523 F. App'x 554, 557 (11th Cir. 2013) ("Given that a primary purpose of both receivership and bankruptcy proceedings is to promote the efficient and orderly administration of estates for the benefit of creditors, we will apply cases from the analogous context of bankruptcy law, where instructive, due to limited case law in the receivership context."). In this respect, it is instructive that the Receiver has not sought a stay of this proceeding.[3]

Finally, the Court does not agree that this suit "involves" agents of Drive Planning sued for acts taken in that capacity. The examples of agents listed (officers, directors, managers, agents, or general or limited partners) indicate persons with authority to operate Drive Planning, not simply those persons acting for its benefit. Accordingly, the Court finds that at this preliminary stage of the

---

[3] Because the Receiver has not been heard on this issue, this Order is without prejudice to the Receiver arguing that this matter was, or should, be stayed under the Receivership Order.

16

proceedings, the Receivership Order does not stay, or warrant dismissal of, the case.[4]

## II. Drive Planning and Burkhalter Are Not Indispensable Parties Under Rule 19(a)(1)

Defendants seek dismissal arguing that Drive Planning and Burkhalter are indispensable parties in this action under Rule 19(a)(1) because complete relief cannot be granted in their absence. Further, Defendants argue that Plaintiffs' claims should be dismissed for infeasible joinder because Drive Planning and Burkhalter cannot be joined due to the Receivership Order. Plaintiffs counter that Drive Planning and Burkhalter are not indispensable since complete relief can be granted without the absent parties, and the absent parties do not have a direct interest in the outcome.

The Court finds that dismissal is not warranted because Drive Planning and Burkhalter are not indispensable parties. Rule 19(a)(1) provides two ways to establish that an absent party is indispensable to the action. First, under Rule 19(a)(1)(A), Defendants must show that the Court "cannot accord complete relief among existing parties." Fed. R. Civ. P. 19(a)(1)(A). Alternatively, Defendants must show that the absent party claims an interest relating to the action and is so situated that the disposition of the action may impair those interests or leave the

---

[4] Any argument about priority of the Receiver's claims over Plaintiffs' claims is vastly premature at this stage.

other parties subject to a substantial risk of incurring multiple or inconsistent obligations. Fed. R. Civ. P. 19(a)(1)(B). The Court addresses each in turn.

**A.      Defendants Have Not Established That Complete Relief Cannot Be Granted Under Rule 19(a)(1)(A)**

Defendants argue that complete relief cannot be granted because Plaintiffs allege that the Defendants are "agents" of Drive Planning. (Doc 23-1 at 7). Additionally, Defendants argue that complete relief cannot be granted without Drive Planning and Burkhalter since these parties are joint tortfeasors whose conduct is "core to the Amended Complaint." (*Id.*). Defendants support this by asserting that Drive Planning and Burkhalter are "the primary actors" of the claim (*Id.* at 9). Specifically, Defendants argue that the absent parties were "active participants in the alleged Ponzi scheme who bear primary responsibility for Plaintiffs' losses." (Doc. 32 at 7).

"It has long been the rule that it is not necessary for all joint tortfeasors to be named as defendants in a single lawsuit." *Temple v. Synthes Corp.*, 498 U.S. 5, 7 (1990). In particular, "Rule 19 does not require joinder of principal[s] and agent[s]." *Axiom Worldwide, Inc. v. Becerra*, No. 808-CV-1918-T-27TBM, 2009 WL 1347398, at *4 (M.D. Fla. May 13, 2009) (determining that the principal was not required to be joined because the agent would be individually liable regardless of the principal's liability).

18

Even when a joint tortfeasor is not considered an agent, the Eleventh Circuit has held in some limited situations that a "joint tortfeasor will be considered a necessary party when the absent party 'emerges as an active participant' in the allegations made in the complaint that are 'critical to the disposition of the important issues in the litigation.'" *Laker Airways, Inc. v. Brit. Airways, PLC*, 182 F.3d 843, 848 (11th Cir. 1999) (*quoting Haas v. Jefferson Nat'l Bank*, 442 F.2d 394, 398 (5th Cir.1971)) (holding that a joint tortfeasor in an antitrust claim was an indispensable party). However, arguing that an absent party is a "central figure" or "active participant" is not alone sufficient to establish that complete relief cannot be granted in all types of claims. *See United States v. Janke*, No. 09-14044-CIV, 2009 WL 2525073, at *3 (S.D. Fla. Aug. 17, 2009). "Courts have been reluctant to extend the 'active participant' theory to areas outside of antitrust claims, where it was originally applied." *Id.* (rejecting the active participant argument for a joint tortfeasor in a fraud claim); *see Axiom Worldwide*, No. 808-CV-1918-T-27TBM, 2009 WL 1347398, at *4 (rejecting the active participant argument outside of the antitrust claims). Instead, where defendants have been directly liable for fraud and are "key players" in the complaint, courts in this circuit have determined that complete relief can be granted without joining any absent tortfeasor. *See Janke*, No. 09-14044-CIV, 2009 WL 2525073, at *3.

19

Here, Defendants' arguments that Drive Planning and Burkhalter are "agents" or "active participants" do not establish that complete relief cannot be granted without joining these absent parties. First, the Court does not agree that this suit involves agents of Drive Planning sued for acts taken in that capacity. As the Court explained above, Defendants are not alleged to be persons with authority to operate Drive Planning, but  simply acting for its benefit.

Second, the facts alleged in the complaint do not establish that complete relief cannot be granted due to the level of involvement by Drive Planning and Burkhalter. Plaintiffs' Amended Complaint alleges that Defendants were key players in perpetuating the fraud by inducing the Plaintiffs to invest in REAL agreements and acting as the point of contact for the Plaintiffs. (Doc. 18 ¶ 56). The complaint further alleges that Defendants sold these securities despite not being registered to sell securities. (*Id.* ¶¶ 58–61). Plaintiffs' alleged harms, although stemming indirectly from the conduct of the absent parties, focus on the direct liability of the Defendants for their part in the alleged fraud.

Defendants rely heavily on a brief opinion in *Kane v. Rose*, which upheld a Rule 12(b)(7) motion due to an SEC-initiated receivership order. 259 F. App'x 258, 260 (11th Cir. 2007). However, *Kane* does not implicate the "very circumstances" of this claim as Defendants argue. (Doc. 23-1 at 6). In *Kane*, the defendant was alleged to have "acted as an agent or employee" of the party under receivership.

*Id.* at 259. Furthermore, the complaint at issue in *Kane* was filed as an ancillary action to the receivership case. *Id.* at 260. In contrast, Defendants are not alleged to be agents of Drive Planning and Burkhalter. Additionally, this case is not an ancillary proceeding because, as the Court explained above, the case does not involve "Receivership Property," does not involve the "Receivership Defendant," and does not involve "agents" of the Receivership Defendants sued in connection with an action in that capacity. In sum, Defendants fail to establish that complete relief cannot be granted under Rule 19(a)(1)(A).

> **B.    The Absent Party Has Not Claimed a Legal Interest Relating to the Subject of This Action Under Rule 19(a)(1)(B))**

Alternatively, Defendants argue that Drive Planning and Burkhalter are indispensable parties because failure to join them "would impair and impede the interests of [Drive Planning and Burkhalter] and, thus, the Receiver." (Doc. 23-1 at 7). Specifically, Defendants list multiple issues "in which the Receiver has a keen interest." (*Id.* at 7–8).

"A prerequisite to the application of Rule 19(a)(1)(B) is that the absent party claim a legally protected interest in the subject matter of the ongoing suit." *Janke*, No. 09-14044-CIV, 2009 WL 2525073, at *4. The party making the motion must establish that the absent party "has claimed an interest" in the action or "sought to intervene to protect its rights such that joinder is necessary." *U-Haul Co. of Ariz. v. Mayberry*, No. 3:19-CV-156-TCB, 2020 WL 6073874, at *4 (N.D. Ga. July 22, 2020).

21

When a receiver declines to intervene in a case, "[a]bsent special circumstances, [courts] will not second-guess the Receiver's assessment" as to the absent party's interests. *Janke*, No. 09-14044-CIV, 2009 WL 2525073, at *4. Accordingly, a receiver's decision not to claim an interest is "sufficient to end the Rule 19(a)(1)(B) analysis" *Id.* Here, the Receiver has not claimed an interest in this case. Therefore, Defendants do not meet the threshold requirement for Rule 19(a)(1)(B).

Since Defendant establishes neither of the potential grounds for a required party under Rule 19(a)(1), the motion to dismiss under Rule 12(b)(7) fails.

## III.    Motion to Dismiss

The Court now turns to Defendants' arguments seeking dismissal of Plaintiffs' Securities Act and state law claims.

### A.    Count I Fails Because There Was No Prospectus Under Section 12(a)(2)

Defendants argue that Plaintiffs fail to state a claim under Section 12(a)(2)[5], which targets certain sales of securities "by means of a prospectus or oral communication," because there was no prospectus. *See* 15 U.S.C. § 77l(a)(2). Plaintiffs respond that the Defendants' "brochures, emails, and videos to the public touting the REAL Loan Agreements, promising returns as high as 46%

---

[5] Citations to "Sections" refer to the Securities Act of 1933 as amended ("Securities Act") unless indicated otherwise.

annually" constitute a prospectus. (Doc. 29 at 18–19). The Court disagrees with

Plaintiffs.

The Securities Act imposes liability when a security is sold "by means of a

*prospectus* or oral communication" that contains a material misstatement or

omission. 15 U.S.C. § 77l(a)(2) (emphasis added). Section 10 of the Securities Act

says a prospectus must contain:

> (a) Information required in registration statement; documents not required. Except to the extent otherwise permitted or required pursuant to this subsection or subsections (c), (d), or (e) —
>
> (1) a prospectus relating to a security other than a security issued by a foreign government or political subdivision thereof, *shall contain the information contained in the registration statement*, but it need not include the documents referred to in paragraphs (28) to (32), inclusive, of schedule A [15 USCS § 77aa];

15 U.S.C. § 77j(a)(1). (emphasis added). The Supreme Court has held that

"prospectus" is "a term of art referring to a document that describes a public

offering of securities by an issuer or controlling shareholder." *Gustafson v. Alloyd*

*Co.*, 513 U.S. 561, 584 (1995). The Court further stated a prospectus document must

generally include "information contained in a registration statement." *See id.* at

569.

Normally, "registration forms call for a description of the company's

properties and business; a description of the security to be offered for sale;

information about the management of the company; and financial statements certified by independent accountants." *See Williamson*, 2025 WL 2379272, at *6 (citation omitted). Other information required in a prospectus includes, "furnishing information on risk factors, ratio of earnings to fixed charges, the use of proceeds, determination of offering price, dilution, the selling security holders, the plan of distribution, a description of securities to be registered, and other information with respect to the registrant." *See id.* (citation omitted).

Here, the brochures, emails, and videos do not contain the information required in a prospectus per 15 U.S.C. § 77j(a)(1): "[A] prospectus relating to a security other than a security issued by a foreign government or political subdivision thereof, shall contain the information contained in the registration statement." Plaintiffs concede as much in the Amended Complaint. (*See* Doc. 18 ¶ 85) ("Neither Plaintiffs nor Defendants had access to the type of information provided in a prospectus of a SEC registration statement such as Form S-1."). The REAL brochures did not contain a "substantial portion" of elements commonly featured in a registration form. *See Gustafson*, 513 U.S. at 583–84. Furthermore, the Court agrees with other courts that have held that "marketing materials . . . are not a substitute for [a] required prospectus." *See In re Edward D. Jones & Co., L.P. Sec. Litig.*, No. 2:18-CV-00714-JAM-AC, 2019 WL 2994486, at *8 (E.D. Cal. July 9, 2019) (denying plaintiffs' Section 12(a)(2) claim predicated on client pitch meetings,

brochures, and other accompanying documents). The absence of a prospectus is fatal to Plaintiffs' 12(a)(2) claim.

Even if the Court found that the REAL brochures and other communications contained the information required for a prospectus, Plaintiffs' Section 12(a)(2) claim would still fail because the securities at issue were sold in a private offering. (Doc. 18 ¶ 60) ("The REAL agreements were sold in a private offering, which did not qualify for any exemptions from registering the offering under SEC regulations."). In *Gustafson*, the Supreme Court made clear that 12(a)(2) is inapplicable to private offerings. *See* 513 U.S. at 581 (holding "[a]s to private transactions . . . there will never have been a registration statement. If § 12(2) liability was imposed here, it would cover transactions not within the contemplated reach of the statute."). Therefore, Plaintiffs' 12(a)(2) claim (Count I) fails.

### B.    Count II is Not Untimely Under Section 12(a)(1)

Defendants also assert that Plaintiffs' Section 12(a)(1) claim in Count II is untimely for two reasons. First, Defendants argue that the claim is barred by the three-year statute of repose. Second, Defendants argue that the claim is limited by the one-year statute of limitations. For the reasons that follow, the Court finds that Count II is timely.

A "Rule 12(b)(6) dismissal on statute of limitations grounds is appropriate 'if it is apparent from the face of the complaint that the claim is time-barred.'" *Gonsalvez v. Celebrity Cruises Inc.*, 750 F.3d 1195, 1197 (11th Cir. 2013) (quoting *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004)). Section 13 of the Securities Act, 15 U.S.C. § 77m, imposes two distinct time bars on 12(a)(1) claims. *Fedance v. Harris*, 1 F.4th 1278, 1284 (11th Cir. 2021). First, Section 13 bars action commenced more than three years after the security was bona fide offered to the public. 15 U.S.C. § 77m ("In no event shall any such action be brought to enforce a liability created under section 77k or 77l(a)(1) of this title more than three years after the security was bona fide offered to the public."). Second, Section 13 bars actions commenced one year after the violation. 15 U.S.C. § 77m ("No action shall be maintained to enforce any liability created . . . under section 77l(a)(1) of this title, unless brought within one year after the violation upon which it is based.").

### 1.    Three-Year Bar

The three-year bar on Section 12(a)(1) claims is a statute of repose. *Fedance*, 1 F.4th at 1285 (citing *Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*, 582 U.S. 497, 505 (2017)). This bar applies when more than three years elapse after the date the security was "bona fide offered to the public." 15 U.S.C. § 77m. At issue is how the Court defines the date of bona fide offer.

26

Defendants argue that Count II is untimely under the three-year bar because Drive Planning first offered the REAL Loan opportunity to the public on September 22, 2020. (Doc. 23-1 at 13). By Defendants' logic, the three-year period expired on September 22, 2023 because the date of bona fide offer is the date that the security was *first* offered to the public. In response, Plaintiff points to caselaw within this Circuit indicating that the date of bona fide offer is the date that the security was *last* offered to the public. (Doc. 29 at 16).

As both parties point out, courts across the country lack consensus on the definition of the date of bona fide offer. *See Biozoom, Inc. Sec. Litig.*, 93 F. Supp. 3d 801, 816 (N.D. Ohio 2015) (using the date the security was first offered to the public); *Ballenger v. Applied Digital Sols., Inc.*, 189 F. Supp. 2d 196, 199 (D. Del. 2002) (using the date that the security was first listed for public trading); *In re Griffin v. PaineWebber Inc.*, 84 F. Supp. 2d 508, 512 (S.D.N.Y. 2000) (using the date the security was registered); *P. Stolz Fam. P'ship L.P. v. Daum*, 355 F.3d 92, 99 (2d Cir. 2004) (using the date the stock was "genuinely" offered to the public to account for the issue of unregistered securities); *In re Bestline Prods. Sec. & Antitrust Litig.*, No. MDL 162-CIV-JLK, 1975 WL 386, at *2 (S.D. Fla. Mar. 21, 1975) (using the date that the security was last offered to the public); *Bradford v. Moench*, 809 F. Supp. 1473, 1487 (D. Utah 1992) (holding that the bona fide date of offer provision is not applicable since unregistered securities are not offered in good faith).

The Court will follow the reasoning of the district court in *Bestline* and define the date of bona fide offer as the date that the security was last offered to the public. *See* 1975 WL 386, at *2. As the *Bestline* court explained, starting the three-year period on the date of first offer would "give individuals a license to sell unregistered securities to whomsoever they wished" in situations where a defendant sold to an initial group of people then "ran the gauntlet for three years." *Id.* (quotation marks omitted); *see also Hudson v. Cap. Mgmt. Int'l, Inc.*, No. C-81-1737 MHP, 1982 WL 1384, at *3, n.3 (N.D. Cal. Jan. 6, 1982) (using the date of last offer); *Stephenson v. Deutsche Bank AG*, 282 F. Supp. 2d 1032, 1064 (D. Minn. 2003) (generally agreeing with *Bestline's* reasoning). This approach makes sense for claims regarding unregistered securities because there is no official registration and therefore no effective date. *See Griffin*, 84 F. Supp. 2d at 512.

Here, based on the date of last offer, the three-year statute of repose has not elapsed. Drive Planning was forced to cease accepting new investments in REAL loans on June 10, 2024. (Doc. 18 ¶ 44). Accordingly, the date that Drive Planning last offered the REALs to the public could be as late as June 10, 2024. Were the Court to follow Defendants' position on the statute of repose, claims would be barred well before Drive Planning ceased accepting new investments. Additionally, since the first of Plaintiffs' alleged security purchases occurred on October 24, 2023, Defendants would have the Court conclude that all of Plaintiffs'

28

claims would be barred before Plaintiffs were ever allegedly defrauded in the first place. (*See id.* at 14). This invokes the very issues raised in *Bestline*, where a seller of unregistered securities runs out the clock for three years and then has "a license to sell unregistered securities to whomsoever they wished." *See* 1975 WL 386, at *2.

In sum, the Court defines the date of bona fide offer to the public under Section 12(a)(1) as the date of last offer. And since the Complaint does not indicate that the date of last offer was any earlier than June 10, 2024, the Court cannot dispose of Count II based on the three-year statute of response on a motion to dismiss. *Gonsalvez*, 750 F.3d at 1197 (quoting *La Grasta*, 358 F.3d at 845)).

### 2.    1-Year Bar

The one-year bar on Section 12(a)(1) claims is a statute of limitations. *Fedance*, 1 F.4th at 1285. As a general rule, the accrual period begins "when the plaintiff has a complete and present cause of action." *Id.* (quoting *Rotkiske v. Klemm*, 589 U.S. 8 (2019)). The Eleventh Circuit has clarified that equitable tolling is available for this one-year bar. *Id.* ("Nothing in the text of section 13 makes equitable tolling inconsistent with that statute. So we presume that equitable tolling is available."). Defendants argue that any claim based on a REAL Loan Agreement signed more than one year before the time of filing is untimely. (Doc. 23-1 at 15).

29

Here, Plaintiffs' Complaint was filed on April 17, 2025. Accordingly, Section 12(a)(1) claims based on transactions that occurred before April 17, 2024 are barred by the statute of limitations. Plaintiffs agree that the one-year bar does apply to some transactions, and that they have limited Count II to transactions within the one-year period. (Doc. 29 at 20). Specifically, Plaintiffs assert that this claim relates to investments made by Arias Legacy on April 18, 2024 and June 5, 2024. (Doc. 29 at 20) (citing (Doc. 18 ¶¶ 93-94). Since Plaintiffs are limiting this claim to these two transactions, the one-year statute of limitations is not an issue. Count II will not be dismissed.

## C.    Carlson and Salerno Lack Statutory Standing for Counts I and II

Defendants argue that Carlson and Salerno lack statutory standing under Section 12. Section 12(a) "provides a private right of action to purchasers to recover the consideration paid for a security sold in violation of Section 5(c), or to recover damages." *Becker v. Mgmt. Servs. Network, LLC,* No. 1:07-CV-0028-RWS, 2007 WL 9703368, at *1 (N.D. Ga. June 20, 2007). This right of action has two threshold requirements under Section 12: (1) the defendant must qualify as a seller, and (2) the plaintiff must qualify as a purchaser. *See Pinter v. Dahl*, 486 U.S. 622, 643 (1988).

Defendants argue that Plaintiffs have not sufficiently alleged that Defendants qualify as "statutory sellers" or "purchasers" of the alleged securities. The Court finds that Plaintiffs have sufficiently alleged that Defendants are

statutory sellers but not that Carlson and Salerno are purchasers and, for the reasons that follow, concludes that Plaintiffs sufficiently alleged that Defendants are statutory sellers.

### 1.    Defendants Are Statutory Sellers

Defendants first argue that Plaintiffs are not "statutory sellers" under Section 12(a), 15 U.S.C. § 77l(a). Section 12(a) requires some "buyer-seller relationship." *Pinter*, 486 U.S. at 642. "The Supreme Court [in *Pinter*] concluded that the term [seller] requires the person to have either (1) passed title of the security to the plaintiff, or (2) successfully solicited the purchase motivated at least in part by his own financial interest." *Nesbeth v. MasterCard Worldwide*, No. 09-62042-CIV, 2010 WL 11601168, at *3 (S.D. Fla. July 19, 2010), *report and recommendation adopted sub nom. Nesbeth v. USIMO*, No. 09-62042-CIV, 2010 WL 11601017 (S.D. Fla. Sept. 9, 2010) (citing *Pinter*, 486 U.S. at 642–47). In contrast, someone whose "motivation is solely to benefit the buyer" does not fall within the scope of Section 12. *Pinter*, 486 U.S. at 647. The operative statutory seller language within Sections 12(a)(1) and 12(a)(2) is identical, and the Eleventh Circuit applies the same definition to both provisions. *See Ryder Int'l Corp. v. First Am. Nat'l Bank*, 943 F.2d 1521, 1526 (11th Cir. 1991) ("Although the *Pinter* Court expressly declined to 'take a position on' the meaning of 'seller' within section 12(2), it conceded in

dicta that most courts and commentators give the term the same meaning as in section 12(1)." (quoting *Pinter*, 486 U.S. at 642 n.20)).

The Supreme Court has clarified that the solicitor, or seller, does not need to be the owner of the security to qualify as a statutory seller. *See Pinter*, 486 U.S. at 643–44 (disagreeing with "[s]everal courts and commentators [that] have stated that the purchase requirement necessarily restricts § 12 primary liability to the owner of the security."). As the Supreme Court explained in *Pinter*:

> A natural reading of the statutory language would include in the statutory seller status at least some persons who urged the buyer to purchase. For example, a securities vendor's agent who solicited the purchase would commonly be said, and would be thought by the buyer, to be among those "from" whom the buyer "purchased," even though the agent himself did not pass title.

*Id.* at 644. Therefore, whether the solicitor is the owner of the security is not dispositive.

To solicit under Section 12, "a person must 'urge or persuade' another to buy a particular security." *Wildes v. BitConnect Intl. PLC*, 25 F.4th 1341, 1346 (11th Cir. 2022) (quoting *Ryder*, 943 F.2d at 1531, 1534); *see also id.* at 1345–46 (noting at the time of the Securities Act's passage in 1933 "[s]olicitation . . . entailed the 'pursuit, practice, act, or an instance, of soliciting,' and 'solicit' meant 'to approach with a request or plea, as in selling'" (quoting *Websters New Int'l Dictionary of the English Language* 2393–94 (2d ed. 1938))). Solicitation under the Act need not be

targeted, personal, or individualized. *See id.* at 1346. Solicitation includes digital means of solicitation that targets broader audiences. *See id.* (recognizing new means of solicitation, including "podcasts, social media posts, . . . online videos and web links").

The scope of "statutory sellers" does not extend to include "participants only remotely related to a sale transaction . . . ." *Ryder*, 943 F.2d at 1527; *see also Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1215 (1st Cir. 1996) ("[A] person's 'remote' involvement in a sales transaction or his mere 'participat[ion] in soliciting the purchase' does not subject him to Section 12 liability." (quoting *Pinter*, 486 U.S. at 651 n.27)). For example, in *Ryder*, the Eleventh Circuit indicated that "lawyers and accountants whose involvement is that of merely providing professional services" do not engage in solicitation and found that a bank "providing financial information concerning the available commercial paper for sale by others and its mechanical act of executing [the order] did not make the bank an 'offeror' or 'seller' under [Section 12(a)(2)].". 943 F.2d at 1521, 1527; *see also Youngers v. Virtus Inv. Partners Inc.*, 195 F. Supp. 3d 499, 522 (S.D.N.Y. 2016) (determining that merely assisting another's solicitation efforts does not fall within the scope of Section 12).

Furthermore, to state a claim under Section 12(a), "a plaintiff must allege not only that the defendant actively solicited investors, but that the plaintiff purchased securities *as a result of* that solicitation." *In re CNL Hotels & Resorts, Inc.*,

33

No. 6:04CV1231ORL-31KRS, 2005 WL 2291729, at *5 (M.D. Fla. Sept. 20, 2005) (emphasis added); *see also In re BitConnect Sec. Litig.*, No. 18-CV-80086, 2019 WL 9104318, at *10 (S.D. Fla. Aug. 23, 2019) (finding that plaintiffs failed to state a claim because they did not allege that they purchased securities "as a result of" the defendants' solicitations). This requires that the plaintiff allege "a direct causal connection between his losses and the defendants' actions." *Licht v. Watson*, 567 F. App'x 689, 692 (11th Cir. 2014) (unpublished). "Mere conclusory allegations that a defendant solicited the sale of stock and was motivated by financial gain to do so are insufficient to state a claim under Section 12." *In re CNL,* No. 6:04CV1231ORL-31KRS, 2005 WL 2291729, at *5. Instead, the plaintiff must allege that it was a "*successful* solicitation." *Rensel v. Centra Tech, Inc.*, No. 17-24500-CIV, 2019 WL 2085839, at *4 (S.D. Fla. May 13, 2019).

Here, Defendants argue that Plaintiffs failed to plead the required causative effect between Defendants' solicitation and Carlson and Salerno's purchases. (Doc. 23-1 at 28). To support this assertion, Defendants point to declarations from Carlson and Salerno describing direct solicitations from Drive Planning and Burkhalter while casting their own role as limited to "[p]roviding introductory marketing one-pagers and website links" rather than direct participation in the ultimate sale. (Doc. 23-1 at 28–30).

34

Since Defendants did not transfer title to Plaintiffs, the Court must determine whether the Amended Complaint plausibly alleges that Defendants "successfully solicited the purchase motivated at least in part by [their] own financial interest[s]." *See Nesbeth*, No. 09-62042-CIV, 2010 WL 11601168, at *3. Plaintiffs allege throughout the complaint that Defendants sought to persuade them to invest through direct communications and marketing materials. (*See* Doc. 18 ¶¶ 82, 83). For example, Plaintiffs allege that Defendants told prospective investors that Defendant IWS had a forensic accountant review the books of Drive Planning and Defendants IWS and Maniaci were satisfied with the results and had personally invested in Drive Planning." (*Id.* ¶¶ 7, 57). Defendants provided the REAL brochure directly to investors by mail, email, and by "handing it directly to prospective investors during in-person sales presentations." (*Id.* ¶ 49). Defendants sent emails directly to Carlson and Salerno, including telling them to "be sure you put [Defendant] Joe Maniaci as your advisor/consultant." (*Id.* ¶ 56). The Court finds that these alleged activities constitute active solicitation of investors sufficient for Section 12(a). Furthermore, this solicitation is alleged to be motivated in part by Defendants' receipt of commissions and other financial incentives for every REAL investment sold. (*Id.* ¶ 28).

Next, the Court must determine whether Plaintiffs sufficiently allege that they purchased the REAL investments as a result of Defendants' solicitations.

35

While Defendants point to actions by Drive Planning and Burkhalter that also contributed to the Plaintiffs' purchase, these do not negate the role of Defendants in inducing Plaintiffs to purchase the REAL investments. The focus of the Court's inquiry under Section 12 is the relationship between the plaintiff and the defendant. *See In re BitConnect*, 2019 WL 9104318, at *10.

Defendants compare this case to the remote participation discussed in *Ryder*. (*See* Doc. 23-1 at 18–19). However, in *Ryder* the bank staff were remote participants in the sale because they only conducted the routine task of identifying the availability of a commercial paper and executing it if the buyer requested. *See* 943 F.2d at 1521. In contrast, Defendants are alleged to have taken targeted efforts to solicit purchases by Plaintiffs.

Defendants also contend that the marketing materials and website links used are insufficient to show a direct connection. To support this assertion, Defendants reference the Southern District of New York's decision in *Youngers* finding that a plaintiff's solicitation through website links was insufficient. (Doc. 23-1 at 30). While the Court finds *Youngers* to be informative, Defendants overstate *Youngers'* applicability to this case. The claim in *Youngers* was insufficient because it alleged that the Defendants only provided those marketing materials through public websites and did not allege any direct relationship between these solicitations and the plaintiffs. *See* 195 F. Supp. 3d at 517 ("The Complaint does not

36

allege that [Defendants] actively or directly marketed the AlphaSector funds to investors. At most, the Complaint alleges that [Defendant] distributed the marketing materials through their website and other channels." (citations omitted) (internal quotation marks omitted)). Thus, the issue was not that the marketing materials were distributed through "one-pagers and website links," as Defendants contend. (*See* Doc. 23-1 at 30). In contrast, Defendants here are alleged to have engaged in a far more targeted use of their marketing materials. As the Eleventh Circuit has explained, [a] seller cannot dodge liability through his choice of communications . . . ." S*ee Wildes*, 25 F.4th at 1346. Thus, the fact that many communications are in the form of digital marketing materials does not extinguish the causal effect of Defendants' communications.

Since Plaintiffs have alleged that their purchases resulted from Defendants' solicitation and that the solicitation was motivated by Defendants' own financial gain, the Court concludes that Plaintiffs sufficiently pleaded that Defendants are "statutory sellers" under Section 12.

### 2.    Carlson and Salerno Are Not Purchasers Under Section 12

"A person only has standing to sue under Section 12 if he purchased securities from the defendant." *Licht*, 567 F. App'x at 691; *see also Becker*, 2007 WL 9703368, at *2 ("To have standing under Section 12 to recover for a violation of Section 5's registration requirement, a person must purchase securities that were

sold in violation of Section 5."). Accordingly, the seller's liability "is limited 'to the person purchasing such security from [the seller]." *Id.* (quoting 15 U.S.C. § 77l(a)). As the Supreme Court explains further in *Pinter*, "One important consequence of this provision is that § 12(1) imposes liability on only the buyer's immediate seller; remote purchasers are precluded from bringing actions against remote sellers. Thus, a buyer cannot recover against his seller's seller." 486 U.S. at 644 n.21.

Here, Defendants argue that Carlson and Salerno did not sufficiently plead that they are "purchasers" of the alleged securities because they were not parties to the REAL Loan Agreements in their individual capacities. (*See* Doc. 18-8). The Court agrees that Carlson and Salerno did not allege that they are the immediate purchaser and therefore do not qualify as "purchasers" under Section 12(a). As such, Carlson and Salerno lack standing and their Section 12(a)(1) and 12(a)(2) claims must be dismissed.

### D.   State Law Claims

Defendants also move to dismiss Plaintiffs' state law claims. To the extent Defendants sought dismissal of these claims if the Court dismissed the Securities Act claims, that request is denied since the Court has denied dismissal of one of those claims. However, the Court agrees that Plaintiffs have failed to adequately plead the state law claims and will dismiss them but give Plaintiffs an opportunity to amend.

### 1.    New Jersey Uniform Securities Law

Plaintiffs bring claims against all Defendants for violations of the New Jersey Uniform Securities Law (1997) ("NJ Securities Act"), NJ Rev Stat § 49:3-47. Defendants argue that these claims are not pleaded with particularity under Rule 9(b). (Doc. 23-1 at 22). The Court agrees. The Rule 9(b) standard applies to claims under the NJUSL's civil liability provision. *Sync Labs LLC v. Fusion Mfg.*, No. CIV. 2:11-03671 WHW, 2013 WL 4776018, at *6 (D.N.J. Sept. 4, 2013) (citing *Home Care Indus. v. Murray*, 00–cv–3305, 2002 WL 32627452 at *7 (D.N.J. Nov. 27, 2002)). Aside from the allegations that Defendants acted as unregistered agents and/or broker-dealers selling unregistered securities, Count III largely restates the NJ Securities Act. This sort of threadbare, conclusory pleading does not come close to the Rule 9(b) standard. Therefore, the Court will grant Plaintiffs leave to amend Count III.

### 2.    Professional Negligence / Negligent Misrepresentation

Under New Jersey common law, "[a] false statement negligently made, and on which justifiable reliance is placed, may be the basis for the recovery of damages for injury sustained as a consequence of such reliance." *Pabon v. Hackensack Auto Sales, Inc.*, 164 A.2d 773, 784 (N.J. Super. Ct. App. Div 1960).[6]

---

[6] The parties both assume New Jersey law applies, and the Court does so for present purposes. *But see Coon v. Med. Ctr., Inc.*, 797 S.E.2d 828, 834 (Ga. 2017) ("In the absence of a statute, however, at least with respect to a state where the common law is in force, a Georgia court will apply the common law as expounded by the courts of Georgia."); *Frank Briscoe Co. v. Ga. Sprinkler Co.*, 713 F.2d 1500, 1503 (11th

Plaintiffs argue that "Defendant IWS told prospective investors that Defendant IWS had a forensic accountant review the books of Drive Planning and Defendants IWS and Maniaci were satisfied with the results and had personally invested in Drive Planning," which they argue is a false statement negligently made. (Doc. 29) (citing Doc. 18 ¶ 7). Defendants essentially attack the reasonableness of Plaintiffs' reliance on this statement (Doc. 23-1 at 28–29), but this is a factual issue better left to be developed during discovery and raised later.

Defendants then argue that Plaintiffs have not pleaded any personal misconduct by Maniaci. (Doc. 23-1 at 34). Indeed, Plaintiffs only allege that IWS told prospective investors about the alleged audit. The Court will permit Plaintiffs leave to amend to clarify whether IWS was acting through Maniaci in this instance.

### 3.      Breach of Fiduciary Duty

Defendants argue that Plaintiffs have not sufficiently pleaded that Defendants owed a fiduciary duty to Plaintiffs. The Court agrees. The Complaint alleges that Defendants were acting as agents for Drive Planning, not for Plaintiffs. (Doc. 18 ¶ 46). *See In re Nw. Mut. Life Ins. Co. Sales Pracs. Litig.*, 70 F. Supp. 2d 466, 489 (D.N.J. 1999), aff'd, 259 F.3d 717 (3d Cir. 2001) (insurance agent not a fiduciary

---

Cir. 1983) ("A federal court faced with the choice of law issue must look for its resolution to the choice of law rules of the forum state.") (citing *Klaxon Co. v. Stenton Elec. Mfg. Co.*, 313 U.S. 487 (1941)).

of applicant for policy); *accord Allen v. ReMax N. Atlanta, Inc.*, 445 S.E.2d 774, 776 (Ga. Ct. App. 1994), *superseded by statute on other grounds Minnix v. Dep't of Transp.*, 533 S.E.2d 75, 78 (Ga. 2000) (agent of seller not a fiduciary of buyer). Moreover, Defendants correctly point out that "Plaintiffs' opposition points to no allegations plausibly establishing that they relied on IWS for corporate due diligence, audit reports, financial analyses or the like regarding Drive Planning or the REAL Loan Agreements." (Doc. 32 at 26). Instead, Plaintiffs only point to the fact that IWS marketed REALs to them. (Doc. 18 ¶¶ 121–22). But Plaintiffs point to no case law establishing a per se fiduciary duty based on such a relationship. Instead, Plaintiffs needed to allege facts, other than the mere fact that Plaintiffs purchased REALs through Defendants, that create a plausible inference that under the governing law, each Plaintiff "place[d] trust and confidence in [Defendants]." (Doc. 29 at 31) (agreeing with Defendants as to the standard for a fiduciary relationship). Because the Court is granting leave to amend, the Court will allow Plaintiffs to amend this count as well.

### 4.    Unjust Enrichment[7]

As the Court noted in footnote 2, above, it appears that Plaintiffs' unjust enrichment count seeks a return of commissions Drive Planning paid to

---

[7] This Count appears to be misnumbered as Count VIII as there are no counts VI or VII in the Amended Complaint.

Defendants. (Doc. 18 ¶ 127). This would constitute an ancillary proceeding reserved to the Receiver under the Receivership Order. Out of an abundance of caution, rather than dismiss or stay, however, the Court will grant Plaintiffs leave to amend this Count to clarify the relief they seek.

## Conclusion

For the reasons given above, it is **ORDERED** that Defendants' Motion to Dismiss (Doc. 23) is **GRANTED IN PART** and **DENIED IN PART**. Count I of the Amended Complaint is **DISMISSED in its entirety**. Count II of the Amended Complaint is **DISMISSED** as to Plaintiffs Carlson and Salerno only. Plaintiffs' claims under the NJ Securities Act (as to all Defendants), for Negligent Misrepresentation (as to Defendant Maniaci), for Breach of Fiduciary Duty (as to all Defendants), and Unjust Enrichment (as to all Defendants) are **DISMISSED WITH LEAVE TO AMEND**.

Plaintiffs are **DIRECTED** to file any amended complaint within 14 days after the date of entry of this Order. Failure to comply with this direction will result in the Court dismissing the claims under the NJ Securities Act (as to all Defendants), for Negligent Misrepresentation (as to Defendant Maniaci), for

Breach of Fiduciary Duty (as to all Defendants), and Unjust Enrichment (as to all

Defendants) with prejudice.

    **SO ORDERED** this 24th day of March, 2026.


_____

Victoria Marie Calvert
United States District Judge