**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

ARIES LEGACY, LLC, a Delaware
corporation, CHRISTIAN CARLSON, DEAN
RALPH SALERNO, ECRE1 LLC,
an Arizona corporation, HUCKLEBERRY          Case No: 1:25-cv-02118-VMC
GLAM, INC., an Arizona corporation,
individually and on behalf of
all others similarly situated,

Plaintiffs,

v.

INTEGRATED WEALTH STRATEGIES, LLC.,
a New Jersey Corporation, and JOSEPH C.
MANIACI, JR., individually,

Defendants.

**SECOND AMENDED CLASS ACTION COMPLAINT**
**AND DEMAND FOR JURY TRIAL**

Plaintiffs ARIES LEGACY, LLC ("Aries"), CHRISTIAN CARLSON ("Mr. Carlson"),

DEAN RALPH SALERNO ("Mr. Salerno"), HUCKLEBERRY GLAM, INC., ("Huckleberry

Glam"), ECRE1, LLC ("ECRE1"), individually and on behalf of all others similarly situated,

by and through their undersigned attorneys, file the instant Second Amended Complaint against

Defendants INTEGRATED WEALTH STRATEGIES, LLC ("IWS"), a New Jersey corporation,

and JOSEPH C. MANIACI, JR. ("Maniaci"). Plaintiffs allege the following upon information

and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal

knowledge. Plaintiffs' information and belief is based upon, among other things, counsel's

investigation, which includes but is not limited to: (a) Documents filed in *SEC v. DRIVE*

1

*PLANNING et. al.,* Northern District of Georgia 1:24-cv-03583-VMC; (b) Documents obtained by Plaintiff and other putative class members from Defendants; (c) Documents and sales materials produced to the public at large when Drive Planning was selling investments; and (d) Review of other publicly available information concerning Defendants.

## I.    INTRODUCTION

1.    This is an action against IWS and Maniaci for promoting a massive Ponzi scheme orchestrated by Russell Todd Burkhalter ("Burkhalter") through his company Drive Planning LLC ("Drive Planning") based in Alpharetta, Georgia. Investors from throughout the United States, including the named Plaintiffs herein, have been victimized the Ponzi scheme.

2.    Using uniform marketing materials and investor agreements, Burkhalter and Drive Planning misrepresented to investors that they would use investor funds to make bridge loans to and/or enter into joint ventures with property developers. Burkhalter and Drive Planning induced investors to invest large sums of money with a promised high return. Investors were urged to use whatever money they had, including their savings, retirement accounts, 529 college plans, and open lines of credit to participate in what, unbeknownst to them, was a fraudulent scheme.

3.    Both Drive Planning and Burkhalter have recently been charged by the Securities and Exchange Commission ("SEC") with originating and engaging in a $300 million Ponzi scheme that defrauded over 2,000 investors. According to the SEC's complaint, filed in the U.S. District Court for the Northern District of Georgia, Drive Planning and Burkhalter lured investors with promises of lucrative returns through purported real estate investments in the form of Real Estate Acceleration Loans (REAL), which were unregistered securities. *See SEC v. Drive Planning, LLC and Russell Todd Burkhalter,* No. 1-24-03583 (N.D. GA, filed August 2024) (aka "SEC Action").

2

4. Defendant IWS is in the business of setting up Charitable LLC's (CLLC's) for people wishing to maximize tax benefits. Defendant Maniaci, one of the principals at IWS, and others employed at IWS became agents of Drive Planning and induced their clients to create CLLC's and invest in Drive Planning products with the promise that their returns from Drive Planning would be tax-minimized.

5. IWS and Maniaci, as agents of Drive Planning, sent their clients various materials created by Drive Planning describing and promoting their most popular "opportunities" for growing wealth passively, including the REAL investments and a CORE Fund, which included the purported purchase of tax liens for investment purposes.

6. By recommending Drive Planning products and inducing their clients to invest in the Ponzi Scheme, IWS and Maniaci ignored their clients' investment objectives and risk-tolerance and caused their clients to lose large sums of money. As alleged in the SEC complaint, Burkhalter actually used the unsuspecting investors' funds to pay earlier investors and to finance his own extravagant lifestyle, including purchasing a multimillion-dollar yacht, luxury cars, and private jets. Defendants were aware, or should have been aware, that their investors' money was unsecured, and that the investment vehicle was nothing more than a massive scheme to defraud. Burkhalter and Drive Planning are not named in this action because of a pending injunction that prohibits actions against them by investors in the pending SEC Action.

7. Plaintiffs bring this action on behalf of themselves and a proposed class of investors to recover funds misused, commingled, and stolen by Burkhalter and Drive Planning which funds investors invested on the direct recommendations of Defendants IWS and Maniaci. Defendant IWS told prospective investors that Defendant IWS had a forensic accountant review

3

the books of Drive Planning and Defendants IWS and Maniaci were satisfied with the results and had personally invested in Drive Planning.[1]

## II.     PARTIES

**Relevant Parties:**

8.   Plaintiff Aries is a limited liability company domiciled in Delaware. Salerno is domiciled in Nevada.

9.   Plaintiff Carlson is a resident of Arizona.

10.  Plaintiff Salerno is domiciled in Nevada.

11.  Plaintiffs Huckleberry Glam and ECRE1 are corporations domiciled in Arizona.

12.   Defendant IWS is a limited liability company whose primary place of business is 375 Kings Highway N, Suite A, Cherry Hill, New Jersey, 08034.

13.   Defendant Maniaci is a resident of New Jersey who at all times relevant herein was a principal at IWS.

**Relevant Non-Parties:**

14.  Drive Planning is a Georgia limited liability company formed by Burkhalter in 2015. Its principal place of business was in Alpharetta, Georgia.

15.  Burkhalter is a resident of St. Petersburg Florida. He is the sole owner of Drive Planning and controlled Drive Planning at all relevant times.

## III.     JURISDICTION AND VENUE

16.  This is a putative class action brought pursuant to Rule 23 of the Federal Rules of Civil Procedure. Plaintiffs seek to represent a class of investors who were fraudulently induced

---

[1] Plaintiffs' certifications are attached hereto as **Exhibit I**.

into purchasing interests in a Georgia limited liability company ("Georgia LLC") that was operating as a Ponzi scheme.

17. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs assert claims arising under The Securities Act of 1933, 15 U.S.C. § 77 *et seq.* ("The Securities Act"). This Court has personal jurisdiction over Defendants pursuant to Georgia's Long-Arm Statute, O.C.G.A. § 9-10-91, and consistent with the Due Process Clause of the United States Constitution. Defendants, while physically located in New Jersey, purposefully availed themselves of the laws and markets of Georgia by marketing, soliciting, and selling investments in a Georgia-based enterprise. Defendants conducted business with the Georgia LLC, induced investors to move funds into Georgia and a Georgia corporation(s), and knowingly enabled and participated in the funneling of investor capital into a fraudulent enterprise headquartered in this State of Georgia.

18. Defendants' conduct was neither random nor attenuated. Defendants knew or should have known that the Georgia LLC's principal place of business was in Georgia, that investment proceeds were wired to accounts in Georgia, and that Georgia residents and institutions were involved in the management and disbursement of investor funds. Defendants' conduct was directed at and had foreseeable effects within the State of Georgia.

19. The claims asserted herein arise directly from Defendants' contacts with Georgia. The injuries suffered by the putative class are a direct and foreseeable consequence of Defendants' efforts to promote and facilitate fraudulent investments in a Georgia enterprise.

20. This Court has specific personal jurisdiction over Defendants IWS and Maniaci because Plaintiffs' claims arise out of Defendants' activity and unlawful conduct and as part of that conduct, Defendants had substantial contact with the perpetrators of the Georgia Ponzi

5

Scheme located in this District, including the conduct by which Plaintiffs were damaged. Venue and personal jurisdiction are proper here because, on information and good faith belief, Defendants solicited and induced Georgia investors who are part of the putative class and these Georgia investors invested hundreds of thousands of dollars into this Ponzi scheme.

21.  Venue is proper in this forum pursuant to 28 U.S.C. § 1391 because Defendants transact business, engaged in misconduct, and/or may be found in this District.

22.  Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this district. Drive Planning, LLC, a Georgia Limited Liability Company, operated the fraudulent scheme in issue from within this district, investor funds were transmitted to accounts located in this district, and key decisions regarding the misappropriation of funds were made within this district, including paying off Defendants to steer investors into this Ponzi Scheme all took place from this district.

### IV.  CHOICE OF LAW

23.  Count I (§ 12(a)(1) of the Securities Act of 1933) is governed by federal law.

24.  Under Georgia's choice of law framework, a federal court sitting in Georgia must look to Georgia's choice of law rules to resolve conflicts. *Frank Briscoe Co. v. Georgia Sprinkler Co.*, 713 F.2d 1500, 1503 (11th Cir. 1983) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941)).

25.  Georgia applies the law of another state as to that state's statutes but applies Georgia common law where the claim is governed by the common law. *Coon v. The Medical Center, Inc.*, 300 Ga. 722, 729–730; *Frank Briscoe*, 713 F.2d at 1503 ("the application of another jurisdiction's laws is limited to statutes and decisions construing those statutes…When no statute

6

is involved, Georgia courts apply the common law as developed in Georgia rather than foreign case law.")(internal citation omitted).

26. Plaintiffs' state law claims are governed by New Jersey law.

27. New Jersey has the most significant relationship with Plaintiffs' state law claims.

28. Defendant IWS is a New Jersey limited liability company with its principal place of business in Cherry Hill, New Jersey.

29. Defendant Maniaci is a New Jersey resident who conducted his financial advisory and solicitation activities from New Jersey.

30. The advice, recommendations, and representations at the core of Plaintiffs' claims were made from New Jersey by New Jersey-based actors operating under New Jersey's regulatory framework.

31. New Jersey requires investment advisors doing business in New Jersey to register with its Bureau of Securities, and Defendants' failure to comply with those New Jersey requirements is central to Plaintiffs' claims.

32. The relationship between the parties was centered in New Jersey: Defendants' business is domiciled New Jersey, Defendants' clients were solicited from New Jersey, and the commissions Defendants received were earned in New Jersey.

33. Accordingly, Plaintiffs invoke New Jersey common law for Counts III (Professional Negligence/Negligent Misrepresentation), IV (Breach of Fiduciary Duty), and V (Unjust Enrichment). In the alternative, if the Court determines that Georgia common law governs any of Plaintiffs' state law claims, Plaintiffs assert those claims under applicable Georgia common law, which provides equivalent duties and remedies based on the same factual predicate.

7

## V.    FACTS COMMON TO ALL COUNTS

**The Beginnings of the Ponzi Scheme according to the SEC Investigation**

34.    In 2020, Drive Planning began offering to the public what it described in promotional materials as a "bridge loan opportunity promising 10% in 3 months." Burkhalter named the investment vehicle "REAL" (an acronym for "Real Estate Acceleration Loan").

35.    On September 22, 2020, Drive Planning received and deposited a check for $50,000 from the first REAL investor into a Drive Planning bank account at Truist Bank. From September 22, 2020, to October 13, 2020, the account only received one additional deposit in the amount of six dollars.

On October 13, 2020, Drive Planning transferred $112,000 out of that account to a self-directed IRA. Of this total, $90,671 in funds (the beginning Truist balance and the six dollar deposit) were unrelated to REAL investments. *See SEC v. Drive Planning, LLC and Russell Todd Burkhalter,* No. 1-24-03583 (N.D. GA, filed August 2024) (aka "SEC Action") at Doc. 1, ¶ 32. This means that the self-directed IRA transfer included at least $21,329 of REAL investment funds.

36.  The self-directed IRA that received the $112,000 transfer, including funds from the first REAL investor, was for the benefit of an individual who had invested in a previous "energy" investment offered by Drive Planning. The terms of that investment called for principal and fixed return to be paid in October 2020.

8

**The Expansion of the Ponzi Scheme according to the SEC Investigation**

37.  Beyond the REAL promotional materials and other website content, Burkhalter and Drive Planning increased the inflow of cash from REAL investors by recruiting and paying sales agents, identified as "financial consultants" on the Drive Planning website.

38.  Burkhalter and Drive Planning paid sales agents, including IWS and Maniaci, a four percent commission on each REAL investment sold, and additional commissions on amounts that investors chose to "rollover" into a new 90-day investment. Burkhalter and Drive Planning further motivated sales agents by creating two clubs for top sales performers: The Presidents Club and the Chairman's Council. Entry into the clubs required selling a certain amount of Drive Planning products, including REAL, and achieving the sales goals resulted in lavish trips and benefits to the commissioned sales agents.

39.  Sales of $2,500,000 entitled the sales agent to membership in the President's Club. Sales of $4,500,000 entitled the sales agent to membership in the Chairman's Council. Membership in each group entitled the sales agent to an all-expense-paid trip for two to destinations including Toronto, Cabo San Lucas, and the Greek Isles.

40.  The sales plan worked. Drive Planning's master spreadsheet ("Spreadsheet"), on which it tracked investments, withdrawals, and other information, shows that, through May 6, 2024, Burkhalter and Drive Planning, with the assistance of sales agents such as IWSs and Maniaci, raised more than $336 million from more than 2,000 investors in at least 48 U.S. states, as well as other countries, with $66.9 million of that amount coming from retirement accounts. Upon information and belief, IWS/Maniaci were paid $550,000 from Drive Planning and additional sums directly from the class members.

41.     The above-referenced Spreadsheet was the only tool by which Drive Planning kept track of REAL investments. Drive Planning did not use accounting software, nor did it keep typical financial or accounting records.

42.     According to the Spreadsheet, Drive Planning paid $131 million of purported returns to investors. Based on the Spreadsheet, Drive Planning owes REAL investors $287,000,000, as of May 6, 2024. According to the SEC Staff Accountant Cody C. Turley, who reviewed the available bank records, those available bank records approximately match these values. The records show that Burkhalter and Drive Planning raised $372 million from investors and repaid investors $154.9 million from September 2020 through June 2024. SEC Staff Accountant Turley has also sworn in an affidavit in the SEC Action that from September 2020 through June 2024, the $372 million that was raised from investors came from more than 2,500 investors that invested funds in the REAL program at Drive Planning.

43.     Bank records show that Drive Planning transferred $65 million to Automatic Data Processing, Inc. ("ADP"), Drive Planning's payroll processor. While Drive Planning did have a few W2 employees whose salaries may be included in that figure, the vast majority of that amount was commission payments to sales agents including the Defendants sales agents in this Case. For example, in a single two-week period, Drive Planning paid its sales agents commissions of $1.92 million.

44.     Because Drive Planning received only $17.6 million from sources other than REAL investors, at least $47.4 million of the above-mentioned $65 million in transfers to ADP must have been sourced from investor funds.

10

**Preserving Capital for the Scheme Through Rollovers**

45.  Drive Planning and the Defendants furthered the scam by prompting investors to "rollover" their REAL investments, including the supposed 10 percent return, at the end of the three-month term. Drive Planning did so by sending an email to investors on or about day 60 of the 90-day term asking whether investors wanted to make a withdrawal, roll over the supposed balance into a new 90-day investment, or add additional funds to the rollover investment.

46.  In connection with solicitation of an election to withdraw or "rollover" the investment, neither Drive Planning nor the Defendants herein ever disclosed that any withdrawal would necessarily be sourced not by a profit, but the principal invested by a later REAL investor, or that any interest credited was a phantom number and not the product of profitable use of the investors' funds. Drive Planning received $8.8 million in REAL investments in 2021, $63.2 million in 2022, $163.1 million in 2023, and $100.3 million in 2024 (through early May 2024). Drive Planning continued to receive additional funds in REAL investments that were collected through June 12,2024.

47.  There was, however, no viable business model for generating the promised ten percent return. Bank records reveal that, contrary to what it represented to investors and prospective investors, Drive Planning was not deploying the cash from REAL investments into bridge loans to developers or joint ventures with developers.

48.  Unbeknownst to investors, Drive Planning did not receive substantial income from loans to or joint ventures with property developers, as their marketing claimed. Rather, Drive Planning's legitimate revenue sources were limited to commissions earned on life insurance sales, membership fees (ranging from $2,000 to $8,000) from clients who received financial planning services, and rental income from a few properties.

11

49. From September 1, 2020, to June 2024, Drive Planning's main accounts received deposits of $389.6 million. Of these deposits, at least $372 million (95.4%) were received from investors in the REAL program. During this same period, Drive Planning only received funds totaling $17.6 million from other sources, with $4 million of that from other investment programs Drive Planning was running.

**Ponzi Scheme Payouts**

50. Based on the bank records, from September 1, 2020, to June 2024, investors received "returns" of approximately $154.9 million. Considering the deposit of $372 million of REAL investor funds, and that only $17.6 millions of potential non-REAL investor funds available, at least approximately $137.3 million of the "returns" were Ponzi payments, sourced from investor funds.

51. Without new investor funds, Drive Planning would not have been able to meet its repayment obligations. For example, in May of 2022, Drive Planning received investor deposits of $3.3 million and non-investor deposits of $41,311 yet paid out $518,874 to investors. In September of 2023, Drive Planning accounts received investor deposits of $16.8 million and non-investor deposits of $270,104 yet paid out $7.1 million to investors.

52. Since September of 2021, Drive Planning does not appear to have been able to generate enough non-investor funds to repay investors. Based on its purported collateral and historical cash flows, Drive Planning was unable to generate future revenue sufficient to pay its investors without inducing new investors to invest and using these new investments to pay older investors.

53. On June 10, 2024, Drive Planning was forced by Truist Bank to cease accepting new investments in REAL as a result of the SEC's freeze of Drive Planning assets, and to cease

12

paying commissions or paying supposed returns to investors. Nevertheless, Drive Planning found a way to continue to pay sales commissions to its sales agents until at least June 21, 2024. It paid Defendant IWS through at least May 31, 2024.

54. Based on good faith investigation, between May 2022 and May 31, 2024, Drive Planning paid Defendants sales commissions of in excess of $1,053,747. Drive Planning paid Defendants sales commissions and other payments related to the Drive Planning Investments totaling $7,715 in 2022, $305,282 in 2023 and $740,750 in 2024.

**Defendants' Acts in Furtherance of the Scheme**

55. IWS and Maniaci offered financial planning and tax advisory services to their clients, including Plaintiffs, and held themselves out as acting in their clients' best financial interests. As part of these financial advisory services, IWS and Maniaci recommended that their clients invest in Drive Planning's REAL program. IWS and Maniaci did not disclose to Plaintiffs that they were also contractually engaged by Drive Planning and received commissions for each REAL investment they facilitated. Plaintiffs reasonably understood Defendants to be their financial advisors, not sales agents for Drive Planning, and relied on Defendants' advice as such. Plaintiffs placed confidence, faith and trust in Defendants in accepting Defendants' financial planning and tax advisory services.

56. The materials distributed by Defendants promise that the products are not speculative, are significantly low in risk, and all have "some form of substantial real estate backing them up." The materials include links to Drive Planning's website for further information. A copy of the email sent by Sandone to Carlson and Salerno, together with the promotional materials transmitted with that email, is attached hereto as **Exhibit A**.

13

57. IWS claims to be in the financial services industry on its LinkedIn page and offers "[a] Strategic Approach to Managing Your Business, Assets, and Taxes." A copy of the IWS website and LinkedIn Page, downloaded March 18, 2025, is attached hereto as **Exhibit B**.

58. IWS and Maniaci also provided their clients with a detailed video presentation describing REAL and CORE investments with Drive Planning. A copy of the presentation video and transcript is attached hereto as **Exhibit C**.

59. In addition, Defendants also provided clients with a portfolio of Real Estate Investments describing the various real estate properties purportedly used as collateral for the REAL and CORE loans. A copy of the portfolio from March 20, 2023, is attached hereto as **Exhibit D**.

60. While named Plaintiffs received individualized communications, Plaintiffs' claims arise primarily from uniform written materials and standardized communications disseminated to all investors, and Defendants' uniform failure to disclose conflicts of interest as well as other critical omissions common to the class.

61. Investments in REAL were and are "securities," as defined by The Securities Act. See 15 U.S. Code § 77b and did not meet any of the exemptions under The Securities Act. As alleged by the SEC, the REAL investments were unregistered securities that did not meet any of the exemptions under The Securities Act.

62. On behalf of Burkhalter and Drive Planning, IWS and Maniaci offered the REAL investments for sale nationwide and accepted investments from international investors. The REAL brochure was promoted to prospective investors through the U.S. mail, by emailing it as a Portable Document Format (PDF), by reproducing it on the Drive Planning website

14

(www.driveplanning.com ), by handing it directly to prospective investors during in-person sales presentations, and by making hard copies available to Drive Planning's sales agents.

63. Drive Planning recruited IWS and Maniaci to sell REAL to prospective investors by claiming that Drive Planning would pool their money and loan it out to property developers, and/or enter joint ventures with property developers, and thereby generate the profit necessary to meet obligations to REAL said prospective investors.

64. IWS and Maniaci sold the investments to Plaintiffs and Plaintiffs were the immediate buyers of the investments in issue.

65. IWS acted by and through Maniaci and its employees, including Sandone, acted at Maniaci's direction. Maniaci was also acting for himself. Maniaci personally and individually made significant money from selling these investments. Maniaci actively participated in the sales of these investments from which he individually benefitted, as did IWS, from Maniaci's acts and omissions.

66. The interest from property developers in doing business with Drive Planning, however, proved insufficient, and Drive Planning had no other profit-generating enterprises sufficient to meet obligations to REAL investors, each of whom expected a ten percent return every 90 days. In fact, Drive Planning did not have any legitimate profitable enterprise capable of generating the sums necessary to pay the promised 10 percent returns every three months. Instead, in classic Ponzi fashion, Burkhalter used money from new investors to pay the supposed "returns" to existing investors and to maintain a luxurious lifestyle.

67. Defendants distributed Drive Planning's marketing materials and promoted the REAL investments without conducting any due diligence to confirm that returns promised to investors were actually being paid from proceeds identified on the marketing materials.

68. Defendants did not disclose to Plaintiffs that they were being paid on commission by Drive Planning based on the initial sale of the securities at issue or reinvestment after the term of each of the securities at issue.

69. At the time Defendants made these assurances, Defendants had no basis for assuming everything would be okay or that investors would be protected.

70. Defendants, who were not licensed to sell securities, solicited Plaintiffs to invest in Unregistered Securities, and failed to disclose the commissions they would be paid for sale of said securities.

71. During December 2022, Defendants induced Plaintiff Carlson to invest in REAL agreements using LLCs ECRE1 and Huckleberry Glam.

72. On October 19, 2023, Angelo Sandone ("Sandone"), a financial consultant employed by IWS, sent an email to Plaintiffs Carlson and Salerno promoting Drive Planning's products and inducing them to invest in those products. **Exhibit A**.

73. On October 24, 2023, in response to questions from Salerno regarding the investments, an employee of Drive Planning instructed him to contact his agent, Maniaci and IWS, with any questions. A copy of said email is attached hereto as **Exhibit E**. A copy of the December 1, 2022, email from Maniaci to Carlson instructed him to "PLEASE NOTE that when you fill these [Drive Planning] applications out, be sure you put Joe Maniaci as your advisor/consultant" is attached hereto as **Exhibit F**.

74. Plaintiff Aries was induced by Defendants to make seven investments to REAL with Drive Planning between October 24, 2023 and June 5, 2024, for a total investment amount of $1,690,000.00. Copies of the seven REAL promissory notes are attached hereto as **Exhibit G**.

16

75. For each investment in the form of a "loan", Plaintiffs were guaranteed an interest rate of ten percent to be payable in three months, with an option to "rollover" all or part of that amount at the same or current rate for another three-month period.

76. The agreements state that a new note is not required for each new three-month period.

77. Each time the investment rolled over, it constituted a new investment made in reliance upon Defendants' acts and omissions.

78. New promissory notes were given in the event an investor added additional funds to the existing loan.

79. The agreements contain an assurance that "This Note is to be secured by real property located in Drive Planning portfolio of properties" until the loan was paid back in full. **Exhibit G.**

80. The agreements were all signed by Burkhalter, CEO, Drive Planning. The promissory notes are summarized as follows in chronological order, as seen in **Exhibit G**:

| Owner | Date | Amount |
|---|---|---|
| Aries Legacy, LLC | October 24, 2023 | $400,000 |
| Dean Ralph Salerno | October 26, 2023 | $75,100 |
| Aries Legacy, LLC | January 18, 2024 | $590,000 |
| Aries Legacy, LLC | February 21, 2024 | $100,000 |
| ECRE1, LLC | March 1, 2024 | $55,000 |
| Aries Legacy, LLC | March 7, 2024 | $245,000 |
| Huckleberry Glam, Inc. | March 21, 2024 | $120,000 |
| Aries Legacy, LLC | March 25, 2024 | $150,000 |
| Aries Legacy, LLC | April 18, 2024 | $105,000 |
| Aries Legacy, LLC | June 5, 2024 | $100,000 |

81. On February 13, 2024, Sandone told Carlson that Defendant IWS had a forensic accountant review Drive Planning's books and they all checked out which was the basis for IWS's confidence in Drive Planning as a viable investment.

82. In December 2023, Defendant Maniaci as part of inducing Plaintiff Salerno to invest in Drive Planning products, and to induce Salerno to invest, Maniaci stated he was investing a large sum of his personal money the next day.

83. In April 2024, Maniaci induced Salerno to invest additional funds in Drive Planning promissory notes. Responding to Salerno's concerns about Drive Planning investments,

84. Maniaci stated: "I had a close friend in Commercial real estate review all the land holdings. All good." A copy of text exchanges between Salerno and Defendant Maniaci regarding these investments is attached hereto as **Exhibit H**.

85. Each of the Drive Planning REAL agreements, which are in essence promissory notes, are "securities" under state and federal securities laws.

86. Defendants were not registered to sell securities. They lacked any Series 7 general securities representative license, were not registered representatives under Financial Regulatory Authority rules, or were not licensed as an investment advisor with the SEC.

87. The REAL agreements were unregistered securities that did not qualify for any exemption from the registration requirements of The Securities Act. Defendants offered and sold these unregistered securities without being registered or licensed to do so, in violation of § 5 of The Securities Act.

88. The REAL agreements, aka promissory notes, were not sold on any national securities exchange.

18

89. On June 12, 2024, two days after Drive Planning was forced by the bank to cease accepting new investments in REAL, and to cease paying commissions or paying supposed returns to investors, Plaintiff Salerno sent an email to Drive Planning requesting a 100% distribution of the funds on all seven REAL promissory notes.

90. On June 14, 2024, Salerno received an email from Drive Planning assuring him that Drive Planning was operating as normal and informing him that he could only change his election for notes maturing from June 20, 2024 through July 14, 2024. Only one of the promissory notes fell within that period. See **Exhibit J**.

91. On June 17, 2024, Salerno was specifically informed he could not redeem a note even though he had only renewed it one week earlier.

92. On July 23, 2024, an email was sent by Drive Planning to Salerno informing him that the delay in disbursing the funds he had requested was a result of the SEC's audit of REAL and CORE investments and again assuring him that he would receive the funds as soon as possible. Defendant Maniaci and Defendant Sandone, the financial consultant from IWS, were copied on all of the emails described in this paragraph. Copies of the emails exchanged between Salerno and Drive Planning in June and July 2024 are attached hereto and made a part hereof as **Exhibit J**.

93. Plaintiffs placed their trust and confidence in Defendants as their financial advisors. Specifically:

    a. Plaintiff Carlson retained IWS to structure his financial and tax planning through a Charitable LLC, and relied on IWS and Maniaci to advise him on investment decisions consistent with his financial goals and tax-minimization objectives.

b. Plaintiff Salerno similarly retained IWS for financial and tax planning services and relied on Maniaci's personal assurances, including Maniaci's representation that he was personally investing his own money in Drive Planning, as evidence that Drive Planning was a sound investment.

c. Defendants affirmatively represented that IWS had performed due diligence on Drive Planning, including a forensic accountant review of Drive Planning's books, and that Defendants were personally invested in the same products they recommended. These representations were made specifically to induce Plaintiffs to trust and rely on Defendants' investment recommendations.

d. Plaintiffs did not have access to, or the expertise to independently evaluate, Drive Planning's financial records, business operations, or the bona fides of its investment products. Defendants were the sole source of information and professional judgment on which Plaintiffs relied in making their investment decisions.

**Orders Granting Motion to Appoint Receiver and Motion for Preliminary Injunctive Relief**

94. On August 13, 2024, the United States District Court for the Northern District of Georgia granted the SEC's Motions to Appoint a Receiver and for Preliminary Injunctive and other Equitable Relief against Drive Planning and Burkhalter. The Court found that:

> The appointment of a receiver was necessary and that the SEC had established a prima facie case that Drive Planning and Burkhalter had engaged in and, unless restrained and enjoined by order of this Court, will continue to engage in acts, practices, and courses of business constituting violations of Section 17(a) of the Securities Act [15 U.S.C. §17q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

*See SEC v. Drive Planning, LLC and Russell Todd Burkhalter,* No. 1-24-03583 (N.D. GA, August 13, 2024); Order Granting  Preliminary Injunction Freezing Assets and Granting Other Equitable Relief, Doc. 11, ¶ 2; Order Appointing Receiver, Doc. 10.

## VI.    CLASS ALLEGATIONS

95.  Class Definition. Plaintiffs bring this claims on behalf of themselves and the following plaintiffs: All individuals who invested in DRIVE PLANNING LLC through IWS or its agents or principals, or JOSEPH MANIACI or his agents or anyone authorized to act on his behalf.

96.  Excluded from the proposed Class and subclasses are judicial officers, the court appointed receiver Defendants, and their respective officers, directors, employees, affiliates, legal representatives, heirs, successors, or assignees. Plaintiff reserves the right to amend the Class definition as necessary.

97.  Certification of the Class is appropriate and warranted under Federal Rule of Civil Procedure 23. The action meets all the requirements of Rule 23(a)(1)-(4), including the numerosity, commonality, typicality, and adequacy requirements, and it satisfies the requirements of Rule 23(b)(3) in that the predominance and superiority requirements are met.

98.  Numerosity. The members of the Class are so numerous that separate joinder of each member is impracticable. According to DRIVE PLANNING LLC's documents, there are at least 40 investors listed as clients of Defendants who were solicited to invest in the REAL program at Drive Planning. Although the number of Class members and their names are presently unknown, this information can be readily determined from Drive Planning's records and SEC filings and associated documents.

21

99. Commonality. Plaintiff's contentions raise predominantly questions of law or fact common to each member of the Class. These common legal and factual questions include, but are not limited to the following:

(A) whether Defendants violated § 12(a)(1) of The Securities Act;

(B) whether Defendants violated the New Jersey Uniform Securities Law (1997);

(C) whether Defendants breached their fiduciary duty to Plaintiff and the Class;

(D) whether Defendants committed professional negligence;

(E) whether Plaintiffs and Class members are entitled to a claim for unjust enrichment or other equitable relief;

(G) whether Plaintiff's and members of the Class sustained damages as a result of Defendants' wrongful actions, and the amount of those damages.

100.  Typicality. Plaintiffs' claims are typical of the claim of each member of the Class, because each class member invested with Drive Planning as a result of the actions of Defendants and were damaged by Defendants' wrongful conduct. Furthermore, the claims arise under legal theories that apply to Plaintiffs and all other class members.

101. Adequacy of Representation.  Plaintiff will fairly and adequately protect and represent the interests of each member of the Class. Plaintiffs do not have claims that are unique to Plaintiffs and not the other class members, nor are there defenses unique to Plaintiffs that could undermine the efficient resolution of the claims of the Class. Plaintiffs are willing and prepared to serve the Court and the Class in a representative capacity with all of the obligations and duties material thereto. Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained counsel experienced in complex consumer class

22

action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no adverse or antagonistic interests to those of the Class.

102. Predominance. The questions of law or fact common to the claim of each member of the Class predominate over any question of law or fact affecting only individual members of the Class.

103. Superiority. Finally, class representation is superior to other available methods for the fair and efficient adjudication of the controversy. In particular:

A) there is little economic incentive or other interest of Class members to individually prosecute separate claims,

(B) Plaintiffs are unaware of any other pending litigation to which any member of the Class is a party and in which any question of law or fact controverted in the subject action is to be adjudicated,

(C) it is certainly desirable to concentrate this litigation in Defendants' home forum, where a receiver can be appointed, and

(D) there appear no difficulties likely to be encountered in the management of the claim or defense on behalf of the Class.

(E) Judicial determination of the common legal and factual issues essential to this case would thus be far more efficient and economical as a class action than in piecemeal individual determinations.

104. Manageability. This case is well-suited for treatment as a class action and easily can be managed as a class action since evidence of both liability and damages can be adduced, and proof of liability and damages can be presented, on a class-wide basis, while the allocation and distribution of damages to class members would be essentially a ministerial function.

23

105. <u>Ascertainability</u>. Class members are readily ascertainable. The class members are identifiable from information and records in the possession, custody, or control of Defendants or the Relevant Non-Parties, as well as the appointed Receiver.

106. All conditions precedent to this action have occurred or have been waived.

## VII.  **LEGAL CLAIMS**

### COUNT I
### Violation of Section 12(a)(1) of The Securities Act of 1933
### [Aries Legacy, LLC v. All Defendants]

107.    Plaintiffs restate and reallege paragraphs 1 through 106 as though fully set forth herein.

108.    For purposes of this Count, Plaintiffs expressly exclude and disclaim any allegation that could be construed as fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability under The Securities Act.

109.    For purposes of this Count, Plaintiffs expressly exclude any transaction occurring before April 17, 2024.

110.    Defendants IWS and Maniaci were each a seller, offeror, and/or solicitor of sale of the REAL agreements to encourage and facilitate investment in the Drive Planning investment vehicle under Section 12(a)(1) of The Securities Act and pertinent common law.

111.    Defendants offered, sold, and/or solicited a security, namely the REAL agreements, by and through making untrue and/or misleading statements of material fact that, in their exercise of reasonable care, they should have known were false.

112.    As seen on page 10 of **Exhibit G**, Defendants induced Aries Legacy, LLC to invest in a promissory note on or about April 18, 2024.

113. As seen on page 11 of **Exhibit G**, Defendants induced Aries Legacy, LLC to invest in a promissory note on or about June 5, 2024.

114. In December 2023, Defendant Maniaci induced Plaintiff Salerno to invest in Drive Planning products, stating he was sending in a large sum of money himself the next day. In April 2024, Defendants induced Plaintiff Salerno to invest in promissory notes. **Exhibit H.**

115. Defendants solicited Plaintiffs in person, over the telephone, through the mail, and through email.

116. Defendants actively solicited the sale of Drive Planning's REAL agreements to serve the interests of Drive Planning, its founder, and themselves.

117. Defendants provided no disclosure to Plaintiffs comparable to the risk factor, management, or financial disclosures required under the federal securities laws, depriving Plaintiffs of information a reasonable investor would consider material in deciding whether to invest.

118. At the time they invested in the REAL agreements, Plaintiffs did not know that the representations made to them by Defendants were untrue and did not know that material facts described above were undisclosed.

119. Plaintiffs did not know, or in the exercise of due diligence could not have known of the untruths and omissions committed by Defendants.

WHEREFORE, Plaintiff respectfully request that the Court enter judgment against Defendants IWS and Maniaci on behalf of Plaintiffs and the class and award compensatory damages in an amount in excess of $5,000,000 and grant any and all further relief that the Court deems necessary or appropriate.

## COUNT II
### Violation of the New Jersey Uniform Securities Law (1997)
### NJ Rev Stat § 49:3-47 (2024)
### [All Plaintiffs v. All Defendants]

120.    Plaintiffs restate and reallege paragraphs 1 through 106 as though fully set forth herein.

121.    Pursuant to section 49:3-49(b) of the New Jersey Uniform Securities Law (1997) (the "NJ Securities Act"), an "agent" means an individual, other than a broker-dealer, who represents a broker-dealer in effecting or attempting to effect purchases or sales of securities. "Agent" does not include an individual who represents an issuer in (1) effecting transactions in a security exempted by subsection (b) of section 3 of P.L.1967, c. 93 (C.49:3-50); (3) effecting transactions with existing employees, partners, or directors of the issuer, if no commission or other remuneration is paid or given directly or indirectly for soliciting any person in this State; or (4) a broker-dealer in effecting transactions in this State limited to those transactions described in paragraph (2) of subsection (h) of section 15 of the "Securities Exchange Act of 1934," 15 U.S.C. s.78o(h)(2); or (5) such other persons not otherwise within the intent of this subsection (b), as the bureau chief may by rule or order designate. A partner, officer, or director of a broker-dealer or issuer, or a person occupying a similar status or performing similar functions, is an agent only if he otherwise comes within this definition."

122.    Defendants acted as unregistered agents doing business in New Jersey with both actual and apparent authority to solicit or effect purchases of Drive Planning investments.

123.    Under the NJ Securities Act, "broker-dealer" means a person engaged in the business of effecting or attempting to effect transactions in securities for the account of others or for his own account. "Broker-dealer" does not include (1) an agent, (2) an issuer, (3) a person

26

who effects transactions in this State exclusively in securities described in paragraphs (1) and (2) of subsection (a) of section 3 of P.L.1967, c. 93 (C.49:3-50), (4) a bank, savings institution, or trust company, or (5) a person who effects transactions in this State exclusively with or through (i) the issuers of the securities involved in the transactions, (ii) other broker-dealers, (iii) banks, savings institutions, trust companies, insurance companies, investment companies as defined in the "Investment Company Act of 1940,"[1] pension or profit-sharing trusts, or other financial institutions or institutional buyers, whether acting for themselves or as trustees or (iv) such other persons not otherwise within the intent of this subsection (c), as the bureau chief may by rule or order designate.

124.    Defendants acted as unregistered broker-dealers in offering Drive Planning investments.

125.    A "security" under section 49-3:49(m) means "any note; stock; treasury stock;  bond; debenture; evidence of indebtedness; certificate of interest or participation in any profit-sharing agreement…; collateral trust certificate; preorganization certificate or subscription; transferable share; investment contract; voting trust certificate; certificate of deposit for a security; certificate of interest in an oil, gas, or mining title or lease; a viatical investment; or, in general, any interest or instrument commonly known as a 'security,'  or any certificate of interest or participation in, temporary or interim certificate for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing. 'Security' does not include any insurance or endowment policy or annuity contract under which an insurance company promises to pay a fixed or variable number of dollars either in a lump sum or periodically for life or some other specified period."

126.    The Drive Planning investments were unregistered securities, not exempt from registration, sold by unlicensed agents and broker-dealers like Defendants.

127.    Pursuant to Section 49-3:52, it is unlawful for a person, in connection with the offer, sale, or purchase of any security, directly or indirectly, (a) to employ any device, scheme, or artifice to defraud; (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements not misleading; (c) to engage in any act practice, or course of business which operates or would operate as a fraud or deceit upon any person; or to (d) fail to deliver the prospectus filed under The Securities Act to each purchaser of a security registered under that act,  in accordance with the prospectus delivery requirements of that Act.

128.    During December 2022, Defendants induced Plaintiff Carlson to invest in promissory notes.

129.    On October 19, 2023, Sandone, a financial consultant employed by IWS, sent an email to Plaintiffs Carson and Salerno promoting and inducing Plaintiffs to invest in Drive Planning's products. **Exhibit A**.

130.    Between October 24, 2023 and June 5, 2024, Defendants induced Plaintiffs to make investments of $1,940,100 in total. The promissory notes are summarized as follows in chronological order, as seen in **Exhibit G**:

| Owner | Date | Amount |
|---|---|---|
| Aries Legacy, LLC | October 24, 2023 | $400,000 |
| Dean Ralph Salerno | October 26, 2023 | $75,100 |
| Aries Legacy, LLC | January 18, 2024 | $590,000 |
| Aries Legacy, LLC | February 21, 2024 | $100,000 |
| ECRE1, LLC | March 1, 2024 | $55,000 |

28

| Owner | Date | Amount |
|---|---|---|
| Aries Legacy, LLC | March 7, 2024 | $245,000 |
| Huckleberry Glam, Inc. | March 21, 2024 | $120,000 |
| Aries Legacy, LLC | March 25, 2024 | $150,000 |
| Aries Legacy, LLC | April 18, 2024 | $105,000 |
| Aries Legacy, LLC | June 5, 2024 | $100,000 |

131. On October 17, 2023, Maniaci represented to Salerno in writing that "I had a close[ ]friend in Commercial real estate review all land holdings [of Drive Planning]. All good." **Exhibit H**. This was false.

132. On March 20, 2024, Maniaci represented to Salerno in writing that he was sending "200[k] to REAL" as an investment. **Exhibit H**. This was false.

133. As seen on page 10 of Exhibit G, Defendants induced Aries Legacy, LLC to invest in a promissory note on or about April 18, 2024.

134. As seen on page 11 of **Exhibit G**, Defendants induced Aries Legacy, LLC to invest in a promissory note on or about June 5, 2024.

135. In October and December 2023 and April 2024, Defendants induced Plaintiff Salerno to invest in promissory notes. A copy of text exchanges between Salerno and Defendant Maniaci regarding these investments is attached hereto as **Exhibit H.**

136. On February 13, 2024, Sandone represented to Carlson that IWS had a forensic accountant review the books of Drive Planning and IWS and Maniaci were satisfied with the results and had personally invested in Drive Planning. This was false.

137. Plaintiffs relied upon the false statements made by Defendants to invest in Drive products.

29

138.    Defendants made each of the foregoing misrepresentations knowing they were false, or with reckless disregard for their truth or falsity.

139.    Defendants knew or should have known that:

a.    Drive Planning had no legitimate real estate revenue stream capable of generating the promised 10% quarterly returns;

b.    Drive Planning was operating as a Ponzi scheme;

c.    the "forensic accountant review" of Drive Planning's books was either nonexistent or materially misrepresented;

d.    the "close[ ]friend in Commercial real estate" that allegedly reviewed all of Drive Planning's land holdings was either nonexistent or materially misrepresented; and

e.    Defendants were earning 4% commissions on each REAL investment, creating a material conflict of interest they did not disclose.

140.    Pursuant to section 49:3-71, any person who offers, sells, or purchases a security in violation of the New Jersey Uniform Securities Law is liable to the purchaser, who may bring an action in either law or in equity, to recover the consideration paid for the security or the investment advice and any loss due to the advice, together with interest set at the rate established for interest on judgments for the same period by the Rules Governing the Courts of the State of New Jersey from the date of payment of the consideration for the investment advice or security, and costs, less the amount of any income received on the security, upon the tender of the security and any income received from the investment advice or on the security, or for damages if he no longer owns the security.

141.    If Plaintiffs had known Defendants' representations were false, they would not have invested in the REAL agreements with Drive Planning.

30

142.    The violations of the New Jersey Revised Statutes as alleged in this action are violations by Defendants that give rise to a civil cause of action and remedies.

143.    Plaintiffs did not discover, and in the exercise of reasonable diligence could not have discovered, Defendants' violations of the NJ Securities Act until the SEC commenced its action against Drive Planning and Burkhalter in August 2024, at which time the fraudulent nature of the REAL investments first became publicly known.

144.    All claims asserted in this Count are timely under NJ Rev. Stat. § 49:3-71, as they are brought within two years of Plaintiffs' discovery of the violations.

145.    Plaintiffs did not discover, and in the exercise of reasonable diligence could not have discovered, Defendants' violations of the NJ Securities Act until the SEC commenced its action against Drive Planning and Burkhalter on August 13, 2024, at which time the fraudulent nature of the REAL investments first became publicly known. All claims asserted in this Count are timely under NJ Rev. Stat. § 49:3-71(g), as they are brought within two years of Plaintiffs' discovery of the violations.

WHEREFORE, Plaintiffs respectfully request entry of judgment in their favor and on behalf of the class and against Defendants, as follows:

(1) Compensatory damages in an amount in excess of $5,000,000;

(2) Prejudgment interest, at the maximum rate allowed under New Jersey law;

(3) Plaintiffs' attorneys' fees, costs, and expenses incurred in this action; and

(4) Such other and further relief as this Court deems appropriate.

31

**COUNT III**
**Control Person Liability Under the New Jersey Uniform Securities Law**
**N.J. Stat. Ann. § 49:3-71(d)**
**[All Plaintiffs v. Defendant Maniaci]**

146.    Plaintiffs restate and reallege paragraphs 1 through 106 as though fully set forth herein.

147.    Section 49:3-71(d) of the New Jersey Uniform Securities Law provides: "Every person who directly or indirectly controls a seller liable under subsection (a) of this section, every partner, officer, or director of such a seller, or investment adviser, every person occupying a similar status or performing similar functions, every employee of such a seller or investment adviser who materially aids in the sale or in the conduct giving rise to the liability, and every broker-dealer, investment adviser, investment adviser representative or agent who materially aids in the sale or conduct are also liable jointly and severally with and to the same extent as the seller or investment adviser, unless the nonseller who is so liable sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts under paragraphs (1) through (5) of subsection (a) of this section which give rise to liability. There is contribution as in cases of contract among the several persons so liable." N.J. Stat. Ann. § 49:3-71(d).

148.    Defendant IWS is liable under subsection (a) and/or (b) of N.J. Stat. Ann. § 49:3-71 for its sale of unregistered securities to Plaintiffs as alleged in Count II above, including its material misrepresentations and omissions in connection with those sales.

149.    Defendant Maniaci is liable as a control person of IWS under N.J. Stat. Ann. § 49:3-71(d) for the following independently sufficient reasons:

   a.  First, Maniaci directly and indirectly controlled IWS at all relevant times. Maniaci was and is a principal of IWS, directed its operations, supervised its employees

32

including but not limited to Sandone, and determined its business activities and client relationships. Maniaci controlled every material aspect of IWS's solicitation of Drive Planning investments, including the decision to affiliate with Drive Planning, the decision to market REAL investments to IWS clients, the specific representations made to each investor, and the use of IWS employees such as Angelo Sandone to carry out those solicitations.

b.  Second, Maniaci occupied the status of a "partner, officer, or director" of IWS within the meaning of § 49:3-71(d), or at minimum occupied a position of equivalent status and performed equivalent functions, as the person who founded and managed IWS and acted as its primary client-facing representative.

c.  Third, Maniaci materially aided in each sale of Drive Planning securities to Plaintiffs. Specifically:

   i.   Maniaci directed IWS employee Sandone to solicit Plaintiffs for Drive Planning investments and to make the representations set forth herein, including the false representation on February 13, 2024 that IWS had retained a forensic accountant to review Drive Planning's books and that Maniaci was personally satisfied with the results;

   ii.  Maniaci personally represented to Plaintiff Salerno, in writing on October 17, 2023, that "I had a close friend in Commercial real estate review all land holdings [of Drive Planning]. All good." — a materially false statement;

   iii. Maniaci personally represented to Plaintiff Salerno, in writing on March 20, 2024, that he was sending "$200[k] to REAL" as his own personal

33

investment — a materially false statement made to induce Plaintiffs'
continued investment and rollovers;

    iv. Maniaci was identified to Plaintiffs as their advisor/consultant, was copied
on all material investor communications, directed the use of Drive
Planning marketing materials with IWS clients, and personally approved
all communications sent by IWS employees to Plaintiffs;

    v. Maniaci personally received financial benefits — including commissions,
club trip benefits, and other compensation — as a direct result of each sale
to Plaintiffs, giving him a direct financial interest in completing each
transaction.

150. Maniaci cannot sustain his burden under § 49:3-71(d) of showing that he "did not
know, and in the exercise of reasonable care could not have known, of the existence of the facts
by reason of which the liability is alleged to exist." To the contrary:

    a. Maniaci personally made representations about Drive Planning's financial health
and his own investment in Drive Planning;

    b. Maniaci affirmatively directed Sandone's February 13, 2024 forensic accountant
representation;

    c. Maniaci received commission breakdowns and Drive Planning internal
communications as a sales agent in Drive Planning's network;

    d. Maniaci was copied on every material investor email, including the June and July
2024 emails in which Drive Planning disclosed to investors that it could not return
their funds;

34

e. No legitimate forensic accountant review of Drive Planning's books was ever performed or disclosed, and Maniaci — as the person who authorized that representation — knew or should have known of its falsity.

151. As a result of Maniaci's control person liability under N.J. Stat. Ann. § 49:3-71(d), Maniaci is jointly and severally liable with IWS for all damages suffered by Plaintiffs in connection with their purchases of Drive Planning securities, including the return of consideration paid plus interest at the legal rate from the date of payment, less the amount of any income received on the security, upon tender of the securities, or for damages if the plaintiff no longer owns the securities.

152. Plaintiffs' claims under this Count are timely for the same reasons stated in Count II. All claims are brought within two years of Plaintiffs' discovery of the violations giving rise to liability, which could not have been discovered before the SEC's commencement of its action against Drive Planning on August 13, 2024. N.J. Stat. Ann. § 49:3-71(g).

WHEREFORE, Plaintiffs respectfully request entry of judgment in their favor and on behalf of the class against Defendant Maniaci, jointly and severally with IWS, as follows:

(1) Return of the consideration paid for each Drive Planning security purchased through or at the direction of Defendants, plus interest at the legal rate from the date of payment, less the amount of any income received thereon, upon tender of the securities to Defendant Maniaci;

(2) Damages equal to the consideration paid for any Drive Planning security that Plaintiffs no longer own, plus interest at the legal rate from the date of payment, less the amount of any income received thereon and any amounts recoverable from the Receiver in the SEC Action;

(3) Plaintiffs' attorneys' fees, costs, and expenses incurred in this action; and

(4) Such other and further relief as this Court deems appropriate.

**COUNT IV**
**Professional Negligence/Negligent Misrepresentation**
**[Against all Defendants]**

153.    Plaintiffs restate and reallege paragraphs 1 through 106 as though fully set forth herein.

154.    To induce Plaintiffs to invest in REAL, Defendants negligently and carelessly made material misrepresentations and omissions as described in detail above.

155.    During December 2022, Defendants induced Plaintiff Carlson to invest in promissory notes.

156.    On December 1, 2022, Maniaci emailed Plaintiff Carlson informing him that Burkhalter and David Bradford of Drive "do an unbelievable job with these investments" and forwarded a link to an email from David Bradford promoting the Drive investments and including the following instruction: "PLEASE NOTE that when you fill these applications out, be sure you put Joe Maniaci as your advisor/consultant." **Exhibit F**.

157.    On October 19, 2023, Sandone, a financial consultant employed by IWS, sent an email to Plaintiffs Carson and Salerno promoting Drive Planning's products. **Exhibit A**.

158.    On February 13, 2024, Sandone, a financial advisor employed by IWS, represented to Plaintiff Carlson that IWS had a forensic accountant review the books of Drive Planning and IWS and Maniaci were satisfied with the results and had personally invested in Drive Planning. This was false.

159.    On October 17, 2023, Maniaci represented to Salerno in writing that "I had a close[ ]friend in Commercial real estate review all land holdings [of Drive Planning]. All good." **Exhibit H**.

36

160.    On March 20, 2024, Maniaci represented to Salerno in writing that he was sending "200[k] to REAL" as an investment. **Exhibit H**. This was false.

161.    Defendant Maniaci was the individual who directed Sandone and other IWS employees to make representations such as that noted above to investors.  At all times, Maniaci was acting both for IWS's financial interest and his individual personal financial interest.

162.    On October 24, 2023, in response to questions from Salerno regarding the investments, an employee of Drive Planning instructed him to contact his agent, Maniaci and IWS, with any questions. **Exhibit E.**

163.    IWS did no due diligence to confirm returns were being paid from legitimate sources.

164.    Neither IWS nor Maniaci disclosed to investors that they were receiving commissions.

165.    Maniaci was a direct participant in the scheme, and knew or should have known that representations made were false.

166.    Maniaci was copied on all investor emails, including emails sent in June and July 2024 when Drive was collapsing.

167.    At all relevant times, IWS acted through its principal, Defendant Maniaci.

168.    Maniaci was the controlling officer of IWS, directed all IWS employees in their dealings with Plaintiffs, personally reviewed and approved all communications sent by IWS to prospective investors, and personally authorized and participated in the solicitation of each investment described herein.

169.    Each act of IWS alleged in this Count was an act of Maniaci in his capacity as principal of IWS, and Maniaci is therefore jointly and severally liable for IWS's negligent

37

misrepresentations as the individual who personally participated in, directed, authorized, and ratified each such misrepresentation.

170. Defendants were negligent and/or careless in ascertaining the truth of the statements made to Plaintiffs and/or they were negligent and/or careless in omitting material facts in statements made to Plaintiffs when inducing them to enter into the REAL agreements.

171. Defendants made such negligent and careless misrepresentations and omissions for the purpose of inducing Plaintiffs to invest in the Notes.

172. Investments in REAL were and are "securities," as defined by federal securities law.

173. As sellers of securities, Defendants had a duty to communicate accurate information to Plaintiffs and not misrepresent information. Plaintiffs relied on Defendants to provide them with accurate information.

174. Defendants are in the business of supplying information for the guidance of others in their business transactions.

175. Plaintiffs justifiably relied upon the negligent and careless misrepresentations and omissions of Defendants, as described herein.

176. If Plaintiffs had known the truth, they would not have invested in the REAL agreements with Drive Planning.

177. Defendants' conduct amounts to malice or gross negligence indicating a wanton disregard for Plaintiffs' rights.

WHEREFORE, Plaintiffs respectfully requests entry of Judgment in their favor and on behalf of the class and against Defendants as follows:

(1) Damages in excess of $5,000,000;

(2) Punitive damages in amount sufficient to punish Defendants' willful and wanton conduct and deter others similarly situated from engaging in such conduct;

(3) Interest;

(4) Costs of suit; and

(5) Such other and further relief as the Court deems just and proper.

## COUNT V
### Breach Of Fiduciary Duty
### [Against All Defendants]

178.    Plaintiffs restate and reallege paragraphs 1 through 106 as though fully set forth herein.

179.    Defendants held themselves out as investment advisors with superior knowledge and experience in investments.

180.    Persons who, for compensation, hold themselves out as financial advisors and undertake to provide ongoing investment guidance to clients are investment advisers within the meaning of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-2(a)(11), and owe those clients a federal fiduciary duty of utmost good faith, full and fair disclosure of all material facts, and undivided loyalty.

181.    That duty requires the adviser to act in the client's best interest at all times, to disclose all conflicts of interest — including compensation arrangements — and to never subordinate the client's interests to the adviser's own.

182.    Under New Jersey law, a fiduciary relationship arises where one party places trust and confidence in another who occupies a dominant or superior position, and an investment adviser who provides ongoing professional guidance owes a duty of prudent, objective advice free from undisclosed conflicts.

39

183.    Defendants IWS and Maniaci held themselves out as financial advisors to Plaintiffs, provided ongoing tax and investment planning services, recommended specific investments.

184.    Defendants failed to disclose to Plaintiffs they earned undisclosed 4% commissions on each investment they facilitated establishing both the relationship and the breach.

185.    For example, Defendants IWS and Maniaci recommended a tax shelter using IWS's lawyer for these investments to Plaintiffs, which some Plaintiffs acted upon. Indeed, as part of the negligent misrepresentation,

186.    Defendants did not disclose the lawyer they recommended Plaintiffs use to implement Defendant's tax advice, was IWS's ongoing and primary lawyer.  Defendants failed to give any warning about conflicts of interest between the lawyer and Plaintiffs – and it is clear the deep conflict of interest is a fact that would have been material in Plaintiffs making investment decisions.

187.    By virtue of their roles as de facto financial advisors, de facto broker-dealers, de facto brokers aka financial advisors, aka registered representatives, aka financial consultants, aka investment advisors, and/or de facto private placement agents, Defendants owed fiduciary duties to Plaintiffs, including the duties of loyalty, good-faith, care, full and fair disclosure and duty to:

    a.  Provide investment advice in Plaintiffs' best interests generally, and under the SEC's Regulation Best Interests (aka Reg BI);

    b.  Refrain from engaging in activities that conflict with Plaintiffs' interest;

    c.  Make full and fair disclosure of conflicts of interest to the extent they cannot be avoided;

d. Provide reasonably available alternative investments;

e. Investigate Drive Planning before recommending any investment concerning Drive Planning;

f. Recommend investments only after studying them sufficiently to become informed as to their nature, price, and financial prognosis;

g. Perform the customer's orders promptly in a manner best suited to serve the customer's interests;

h. Inform the customer of the risks involved in purchasing or selling a particular security;

i. Refrain from self-dealing; and

j. Not to misrepresent any material fact to the transaction.

188.    IWS held itself out to Plaintiffs as a provider of financial planning services. IWS and Maniaci, as one of its principals, are in the business of setting up Charitable LLC's (CLLC's) for people wishing to minimize their taxes. IWS and Maniaci induced clients seeking to minimize taxes to create CLLC's and invest in Drive Planning products with the promise that their returns from Drive Planning would be tax-minimized.

189.    As entities or individuals holding themselves out as investment advisors, IWS and Maniaci owed Plaintiffs a fiduciary duty to act in their best interests.

190.    As entities or individuals holding themselves out as investment advisors in New Jersey, IWS and Maniaci were required to register with the state's Bureau of Securities or the SEC.

191.    It is unlawful for any person to act as an investment adviser in New Jersey unless that person is registered, exempt or notice filed with the Bureau of Securities.

41

192.    Defendants did not register as investment advisers with New Jersey's Bureau of Securities.

193.    Defendants breached the fiduciary duties they owed to Plaintiffs by:

a.  Negligently misrepresenting and omitting the true nature of the investments;

b.  Negligently misrepresenting the true value of the investments;

c.  Failing to disclose that they failed to reasonably investigate the REAL investments, including claims made by the issuer, Drive Planning, including but not limited to claims in Drive Planning's brochures and other promotional materials regarding the source of promised proceeds, and claims made by Drive Planning's principal, Todd Burkhalter, as required of financial advisors and professionals in recommending investments; and

d.  Other breaches of fiduciary duty as described herein.

194.    A corporate officer who personally participates in a tort is individually liable regardless of corporate form.

195.    Defendant Maniaci is personally liable for the breaches of fiduciary duty alleged herein because he was not acting merely as a corporate officer directing IWS employees. Maniaci personally participated in each of the acts constituting a breach, including:

a.  personally making false representations to Plaintiffs regarding his own investment in Drive Planning;

b.  personally directing Sandone and other IWS employees to make the forensic accountant representation to Plaintiffs;

c.  personally receiving commissions on Plaintiffs' investments while concealing that conflict of interest; and

42

    d.   personally remaining copied on all investor communications as Plaintiffs' funds were trapped in the collapsing scheme without warning Plaintiffs.

196.    Defendants' breach of fiduciary duties caused injury and damages to Plaintiffs.

197.    As a direct or proximate result of Defendants' breaches, Plaintiffs have suffered damages which consist of investment losses in excess of $5,000,000.

WHEREFORE Plaintiffs respectfully request entry of Judgment in their favor and on behalf of the class and against Defendants as follows:

(1) Compensatory damages in excess of $5,000,000;

(2) Disgorging from Defendants any fees, commissions or other compensation that they received in connection with causing Plaintiffs to enter into the REAL agreements.

(3) Awarding Plaintiffs their costs and expenses incurred in this action;

(4) Awarding Plaintiffs punitive damages in an amount sufficient to deter similar misconduct in the future; and

(5) Awarding Plaintiffs such other and further relief as is appropriate.

**COUNT VI**
**Unjust Enrichment**
**As an alternative to Counts I through VII**
**[Against All Defendants]**

198.    Plaintiffs restate and reallege paragraphs 1 through 106 as though fully set forth herein.

199.    Through its unauthorized and continued use of Plaintiffs' funds, in the form of Plaintiffs' investment principal and the funds Plaintiffs paid to Drive Planning as a result of and proximately caused by Defendants' direct solicitation, Defendants have enjoyed and continue to enjoy an unjust benefit at the expense and to the detriment of Plaintiffs.

200.    Plaintiffs invested much of their life savings and retirement funds with Drive Planning, based upon Defendants' recommendations, with the reasonable expectation that the invested funds would be returned with interest.

201.    Through their conduct in inducing Plaintiffs to invest in Drive Planning's fraudulent scheme, Defendants received a direct financial benefit at Plaintiffs' expense.

202.    Specifically, Defendants received compensation, including referral fees and other remuneration funded by or traceable to Plaintiffs' specific investment amounts, that they would not have received but for Plaintiffs' investments.

203.    This benefit was conferred by Plaintiffs, not by Drive Planning, to the extent Defendants' compensation and financial benefits (beyond the 4% commissions) was funded by Plaintiffs' specific investment principal.

204.    Defendants have been unjustly enriched by retaining these benefits above and beyond the commissions, while Plaintiffs have lost their entire investment.

205.    IWS was paid commission based on the following investments of Plaintiffs as seen in **Exhibit G**:

| Owner | Date | Amount |
|---|---|---|
| Aries Legacy, LLC | October 24, 2023 | $400,000 |
| Dean Ralph Salerno | October 26, 2023 | $75,100 |
| Aries Legacy, LLC | January 18, 2024 | $590,000 |
| Aries Legacy, LLC | February 21, 2024 | $100,000 |
| ECRE1, LLC | March 1, 2024 | $55,000 |
| Aries Legacy, LLC | March 7, 2024 | $245,000 |
| Huckleberry Glam, Inc. | March 21, 2024 | $120,000 |
| Aries Legacy, LLC | March 25, 2024 | $150,000 |
| Aries Legacy, LLC | April 18, 2024 | $105,000 |

44

| Owner | Date | Amount |
|---|---|---|
| Aries Legacy, LLC | June 5, 2024 | $100,000 |

206.    Defendants are unjustly reaping the benefits of Plaintiffs' money.

207.    Defendants' retention of Plaintiffs' money violates the fundamental principles of justice, equity and good conscience, which principles require that all such assets be turned over to Plaintiffs.

208.    Plaintiffs have no adequate remedy at law.

209.    Plaintiffs expressly disclaim any recovery in this Count of commissions paid by Drive Planning to Defendants from Drive Planning's general funds, which relief is reserved to the Receiver in *Murena v. CQ Consulting Servs.*, No. 1:25-cv-04587 (N.D. Ga.) or any other ancillary related proceeding brought by the Receiver.

WHEREFORE, Plaintiffs respectfully request entry of Judgment in their favor and on behalf of the class and against Defendants, as follows:

(1) Restitution in the amount of the financial benefit Defendants received that is directly traceable to and funded by Plaintiffs' investments, in an amount to be proven at trial;

(2) Disgorgement of all amounts that Defendants were unjustly enriched including, but not limited to any referral fees, advisory fees, trips, kickbacks, or other compensation paid to Defendants which funded by, or connected to, Plaintiffs' investment principal;

(3) Such other equitable relief as the Court deems appropriate;

(4) That Plaintiffs recover their costs of suit and reasonable attorneys fees; and

(5) That the Court grant Plaintiffs such other and further relief as this Court deems appropriate.

Dated: May 7, 2026

45

Respectfully Submitted,

/s/   Ross M. Good

Ross M. Good, Esq.
The Good Law Group
800 E. Northwest Hwy, Ste 814
Palatine, IL 60074
Ph: (847) 577-4476
Fax: (800) 709-1179
(IL Bar No. 6312917;
FL Bar No. 0116405)
Ross@thegoodlawgroup.com

Shawn M. Good Esq.
(IL Bar No. 632932)
The Good Law Group
800 E. Northwest Hwy, Ste 814
Palatine, IL 60074
Ph: (847) 577-4476
Fax: (800) 709-1179
Shawn@thegoodlawgroup.com

Jeffrey Sonn, Esq.
Sonn Law Group PA
19495 Biscayne Blvd Suite 607
Aventura, Fl 33180
Tel 305-912-3000
Fax 786-485-1501
FL Bar No. 773514
Jsonn@Sonnlaw.com

Brian B. Pastor, Esq.
Sonn Law Group
PA 3455 Peachtree Rd NE, Ste. 500
Atlanta, GA 30326
Tel: 305-912-3000 Ext. 538
Fax: 404-607-7121
GA Bar No. 565860